995 F.2d 1526
 Anthony LaMARCA, Martin Saunders and Edwin Johnson,
individually and on behalf of all others similarly situated,
and David Aldred, Steve H. Bronson, Jr., Eddie Cobb, Ron
Durrance, Wayne Epprecht, Michael Gordon and Billy Joe
Harper, individually, Plaintiffs-Appellees,
v.
R.V. TURNER, individually in his former capacity as
Superintendent of Glades Correctional Institution, Chester
Lambdin, in his official capacity as Superintendent of
Glades Correctional Institution, Defendants-Appellants.
 No. 90-5909.
 United States Court of Appeals,
Eleventh Circuit.
 July 7, 1993.
 
 Michael B. Davis, Davis, Carroll, Colbath & Isaacs, & Stinson, P.A., West Palm Beach, FL, Walter M. Meginniss, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, FL, for defendants-appellants.
 David M. Lipman, Miami, FL, William R. Amlong, Amlong & Amlong, Ft. Lauderdale, FL, James A. Tucker, Florida Rural Legal Services, Inc., Fort Myers, FL, for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and WILLIAMS*, Senior Circuit Judge.
 TJOFLAT, Chief Judge:
 
 
 1
 This is a suit brought by ten present and former inmates of Glades Correctional Institution (GCI), a Florida prison. They seek individually, under 42 U.S.C. § 1983 (1988), money damages for cruel and unusual punishment they allege they suffered because of the deliberate indifference of a former superintendent of the institution, Randall Turner. The plaintiffs still housed at GCI also seek an injunction, on behalf of all present and future inmates at the prison, against the current superintendent, Chester Lambdin, to correct certain allegedly unconstitutional conditions of confinement.
 
 
 2
 After the parties joined issue (on the plaintiffs' third amended complaint), the district court, having denied Turner's demand for a jury trial, tried the ten damages claims and entered judgment for eight of them.[1] Turner appealed, but we dismissed the appeal for want of a final judgment as the district court had not disposed of the still pending claim for injunctive relief. LaMarca v. Turner, 861 F.2d 724 (11th Cir.1988) (Table) (the first appeal). After our order dismissing the appeal reached the district court, Turner moved the court to reopen the record on the plaintiffs' damages claims so that he could introduce some additional evidence on the issue of liability. The court, concluding that it lacked jurisdiction to revisit those claims, denied the motion. The court then turned to the claim for injunctive relief.
 
 
 3
 After hearing five days of testimony relating to the current conditions of confinement, the court identified several areas of concern that "require[d its] attention." Although the challenged prison conditions had improved considerably, the court concluded that injunctive relief was necessary. The court's final judgment therefore granted injunctive relief and the money damages previously awarded, along with attorney's fees under 42 U.S.C. § 1988 (1988). The instant appeal is from that final judgment. Turner appeals the damages awards; Lambdin appeals the injunction.
 
 
 4
 We now vacate all of the damages awards and remand them for further proceedings. We do so as to five of the appellees because the court should have honored Turner's demand for a jury trial. As to the three remaining appellees, the court applied the wrong legal standard for Eighth Amendment damages liability and, moreover, erred in concluding that it lacked jurisdiction (following dismissal of the first appeal) to reopen the record and entertain the evidence Turner proffered in defense of the damages claims. Finally, we vacate in part the injunction against Lambdin and remand the matter of equitable relief for further proceedings.
 
 
 5
 Part I of this opinion outlines the case's procedural history and describes the facts underlying the damages claims and the claim for injunctive relief. Part II rejects Turner's argument that the plaintiffs failed to present sufficient evidence to prevail, but holds that the district court applied the wrong legal standard for Eighth Amendment liability for money damages. Part III addresses the district court's grant of injunctive relief. Part IV considers Turner's Seventh Amendment jury demand. Finally, part V reviews Turner's attacks on the trial court's treatment of his motions to continue and to augment the trial record.
 
 I.
 A.
 
 6
 On May 14, 1982, Anthony LaMarca, then an inmate at GCI, filed a handwritten pro se complaint in the district court stating that he had "been countlessly approached, threatened with physical violence and assaulted by other inmates at [GCI] because [he] refused to participate in homosexual activities, or pay protection to be left alone."[2] He alleged that "a severe lack of protection" existed at GCI and that "the institution seem[ed] unable or unwilling to handle the situation." On September 21, 1983, LaMarca, having obtained counsel, filed an amended complaint adding three other GCI prisoners as plaintiffs, Martin Saunders, Edwin Johnson, and Henry Rosenbaum.[3] Each prisoner sought damages under 42 U.S.C. § 1983, and, as class representatives, "injunctive relief for all ... present and future inmates of GCI."[4] On November 2, 1983, the defendants, Turner and Lambdin, filed their answer to the first amended complaint.[5]
 
 
 7
 On August 26, 1985, more than a year and a half after the defendants answered the first amended complaint, the plaintiffs moved the court to amend the complaint a second time, adding seven plaintiffs, David Aldred, Steve H. Bronson, Jr., Eddie Cobb, Ron Durrance, Wayne Epprecht, Michael Gordon, and Keith Harris. Each alleged that he was assaulted while an inmate at GCI, and sought damages against Turner under 42 U.S.C. § 1983.
 
 
 8
 The defendants objected to the joinder of these additional plaintiffs, claiming that the joinder would unreasonably burden their preparation for trial which was then set for November 4, 1985. Nevertheless, the magistrate judge who was to hear the case granted plaintiffs' motion to amend.[6] The defendants immediately requested a continuance of the trial, arguing that in light of the presence of the seven new plaintiffs, they required at least ninety days for additional discovery and trial preparation. The magistrate judge granted the defendants a one-month continuance, resetting the trial for December 2, 1985. On November 8, 1985, the defendants filed a demand for jury trial "of all issues so triable."[7]
 
 
 9
 On November 13, 1985, Turner and Lambdin requested another continuance, claiming that they could not complete discovery and prepare for trial by the December 2 trial date. Two days later, before the court could act on the motion, the plaintiffs moved the court for leave to file a third amended complaint, adding another plaintiff, Billy Joe Harper, who sought damages against Turner, and dropping Harris from the suit. The court referred both motions to the magistrate judge. On November 28, the magistrate judge gave the plaintiffs leave to amend, but refused to grant the defendants a continuance or a jury trial. The defendants, pursuant to S.D.Fla.Mag.J.R. 4(a), immediately appealed the magistrate judge's rulings to the district court. On December 2, the court affirmed these rulings and the trial began.
 
 
 10
 To summarize, on December 2, the case proceeded to trial on the allegations of the third amended complaint. This complaint stated section 1983 claims for damages against Turner, individually, by LaMarca, Saunders, and Johnson (the original plaintiffs), and Aldred, Bronson, Cobb, Durrance, Epprecht, Gordon, and Harper (the new plaintiffs). The original plaintiffs also served as representatives for purposes of the class action claim for injunctive relief against Lambdin in his official capacity as superintendent of GCI.
 
 B.
 
 11
 The magistrate judge, operating under S.D.Fla.Mag.J.R. 1(f), commenced the bench trial. At the plaintiffs' request, the magistrate judge bifurcated the proceeding, indefinitely postponing consideration of the claim for injunctive relief. The trial, therefore, considered only the damages claims against Turner. The following is a brief statement of the facts the court found.[8]
 
 
 12
 The inmate assaults complained of occurred between 1981 and 1984, during Turner's tenure as superintendent. GCI had four dorms ("A", "B", "C", "D").[9] The A and D dorms each had two wings containing three rows of twenty bunk beds. The B and C dorms were smaller, but also had bunk beds arranged in three rows. Each dorm had a shower, located at one end of the building, and a "wicket," or cage, located in the center of the dorm, that provided officers with a vantage point from which to observe the inmates. A guard's view from the wicket into the interior of the dorm and the shower area was obstructed by sheets and towels the inmates hung from their bunk beds, the placement of bunk beds next to the isles leading to the shower area, and opaque glass on the shower door. While officers were supposed to patrol the interiors of the dorms regularly, they did not.
 
 
 13
 The prison also maintained cells for disciplinary, administrative, and protective confinements. This special detention suffered from substandard conditions. The cells lacked adequate ventilation, had poor lighting, and were infested with roaches and vermin. Prisoners were allowed little or no exercise, only three showers a week, no canteen privileges, and only limited use of the law library. Inmates in the general population could gain access to the confinement area by crawling under a poorly maintained fence or with the permission of the guard in charge of the area. These confinements, therefore, failed to insulate inmates from their tormentors. Finally, an inordinate number of inmates requested protective confinement, leading to overcrowding and indicating that a serious problem existed in the general population. The court found that the conditions in protective confinement were substandard, and therefore discouraged inmates from remaining in this potential safe-haven.
 
 
 14
 Turner, in a July 16, 1981 letter to his superior, described the prevailing atmosphere at GCI: "On an almost daily basis I feel that our security staff is simply being tolerated by the inmate population rather than being in control of the operation of the institution." LaMarca, 662 F.Supp. at 673. The presence of contraband (weapons, alcohol, and drugs), corruption of GCI's staff, inmate violence, and homosexual activity were accepted as part of prison life.
 
 
 15
 While a minimal level of contraband may be an unavoidable aspect of prison life, excessive quantities of contraband flowed freely into and within the prison. Prison officials made "little or no effort ... to control illicit activity at GCI, resulting in readily-available contraband." Id. at 657. Inmates carried knives and openly used drugs. The contraband problem was compounded by staff corruption, as prison officials contributed to, and apparently profited from, the contraband, and utilized prisoners to "control" and punish other prisoners.
 
 
 16
 GCI's staff permitted regular, unsupervised showings of hard-core pornographic movies. As Dr. Swanson, an expert witness for the plaintiffs, testified, these movies "would only serve to maximize the possibility of sexual and other violence." Indicative of this observation, during the movies, "[s]ounds of inmates screaming and crying could be heard."
 
 
 17
 When alerted to specific dangers, prison staff often looked the other way rather than protect inmates. Rather than offer to help, the staff suggested that the inmates deal with their problems "like men," that is, use physical force against the aggressive inmate.[10]
 
 
 18
 Several management problems persisted during Turner's tenure as superintendent: low morale among the prison's staff, high employee turnover (leading to a less experienced staff), high vacancy rates for staff positions, and inadequate supervision of employees.[11] As Turner confirmed, these problems had a direct effect on GCI's ability to maintain security. Certain of the prison's standard operating procedures were insufficient to protect prisoner safety. For example, the procedures for investigating rapes, to the extent such procedures existed, were not followed; some of the reported incidents were not investigated at all. The lack of such procedures created an atmosphere of tolerance of rape which enhanced the risk that incidents would occur. Id. at 678 (finding an atmosphere where "inmates could rape other vulnerable inmates without concern of being detected or deterred").
 
 
 19
 Aggression was commonplace and exacerbated by the readily available contraband and an excessively permissive atmosphere. While underfunding, overcrowding, and a lack of security personnel no doubt contributed to these problems, Turner could have controlled the permissive atmosphere through proper supervision and could have remedied the contraband problems with inexpensive modifications to the prison's procedures and physical plant. In sum, as the court concluded, "Turner's overall laxity in managing and controlling his staff" directly contributed to an unconstitutional condition of confinement at GCI consisting of an undeterred atmosphere of violence. Id. at 662, 684.
 
 
 20
 For purposes of this appeal, the appellants concede the credibility of the plaintiffs' accounts of the alleged assaults. A group of inmates, one brandishing a bush ax, made an unsuccessful attempt sexually to assault LaMarca in a dorm. Inmates raped Saunders in a small bathroom adjacent to the confinement area; he reported the incident but officials did not investigate and refused his request for a medical examination. Inmates repeatedly attacked Johnson while he was in protective confinement. Inmates raped Aldred and Durrance in shower areas. Aldred reported the incident to an officer, but there was no investigation. Bronson was sexually assaulted with the handle of a baseball bat on GCI's recreation field. Cobb was stabbed by an inmate who, because of his cooperation with guards in conducting illicit activities, was protected.
 
 C.
 
 21
 On January 8, 1986, after the parties had filed proposed findings of fact and conclusions of law, and had argued them before the magistrate judge, the magistrate judge issued a 135-page "Report and Recommendation" recommending a specific damages award for each of the ten plaintiffs. The district court reviewed the magistrate judge's report de novo, see Federal Magistrate's Act, 28 U.S.C. § 636(b)(1) (1988); S.D.Fla.Magis.J.R. 4(b), and adopted his recommendations in all relevant detail as to eight of the plaintiffs.[12] The court entered judgment accordingly on June 4, 1987.[13]
 
 
 22
 As noted earlier, although the district court had neither addressed nor disposed of the claim for injunctive relief, Turner appealed to this court. We dismissed the appeal for want of a final judgment and returned the case to the district court for further proceedings on that claim.
 
 D.
 
 23
 On the first day of trial before the district court on the claim for injunctive relief, David M. Lipman, counsel for the inmate class, conceded that the atmosphere at GCI had changed "in such a manner that as to [many] conditions and practices, [the class] no longer [sought] injunctive relief."[14] Although the district court observed that Superintendent Lambdin "appears to be a dedicated public servant," and that physical conditions at GCI were "generally satisfactory," the court found "ample room for improvement in the conditions at GCI." In the court's view, the superintendent and his staff still did not take the threat of inmate violence seriously enough. In particular, they failed to ensure that GCI's policies designed to protect prisoners, including regular security patrols, were properly carried out. Finally, the court concluded that GCI's failure to make adequate psychological counseling available to rape victims constituted cruel and unusual punishment because it constituted deliberate indifference to a serious medical need.[15] See generally Estelle v. Gamble, 429 U.S. 97, S.Ct. 285, 50 L.Ed.2d 251 (1976).
 
 
 24
 Concluding that Lambdin had not shown that "the wrongs of the past could not reasonably be expected to recur," the court ordered injunctive relief. On October 6, 1990, the court entered a final judgment (1) providing such relief, (2) incorporating by reference the judgment it had entered on June 4, 1987, which awarded eight of the plaintiffs money damages against Turner, and (3) awarding the plaintiffs attorney's fees.
 
 II.
 
 25
 Turner challenges the court's determination that he was deliberately indifferent to the plaintiffs' safety in violation of the Eighth Amendment and 42 U.S.C. § 1983. He asserts that the plaintiffs failed to make out a case of liability against him--in particular, he claims that the evidence does not support the district court's findings of fact--and that the court applied the wrong legal standard in determining liability. We conclude that although the record contains sufficient evidence upon which the district court could find liability, the court failed to make certain essential findings of fact and erred in its legal analysis. Consequently, we return this case to the district court for further consideration.
 
 
 26
 In subpart A, we review the elements necessary to establish Turner's liability for money damages under section 1983 and the sufficiency of the evidence presented as to each element. We review the evidence presented at trial in the light most favorable to the plaintiffs. Whitley v. Albers, 475 U.S. 312, 322, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). Because we conclude that the evidence was sufficient as to each element, in subpart B we address Turner's specific challenges to the legal standard the district court employed. As discussed in part IV, Turner was entitled to a jury trial as to the new plaintiffs' claims; we, therefore, only review these challenges in the context of the original plaintiffs' claims.
 
 A.
 
 27
 The plaintiffs claim that Turner failed to provide them with reasonable protection from prison violence in violation of the Eighth Amendment. The plaintiffs do not argue that Turner knew of specific threats to their safety. Rather, they argue that Turner failed to ensure their protection from the general danger arising from a prison environment that both stimulated and condoned violence. This theory of liability creates substantial, but, as we shall see, not insurmountable obstacles to the plaintiffs' claims.
 
 
 28
 To prevail on their Eighth Amendment claim for damages brought under section 1983, the plaintiffs must prove three elements:[16] (1) a condition of confinement that inflicted unnecessary pain or suffering, Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), (2) the defendant's "deliberate indifference" to that condition, Wilson v. Seiter, --- U.S. ----, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991), and (3) causation, Williams v. Bennett, 689 F.2d 1370, 1389-90 (11th Cir.1982).[17] For our purposes, the Eighth Amendment defines the contours of the first two elements and section 1983 delimits the third.
 
 1.
 
 29
 First, the condition must have inflicted unnecessary pain or suffering upon the prisoner. This objective standard "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...,' " but must be balanced against competing penological goals. Gamble, 429 U.S. at 102, 97 S.Ct. at 290 (quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir.1968)). The evidence presented at trial of an unjustified constant and unreasonable exposure to violence at GCI, as described in part I.B., clearly satisfies this standard. Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir.1986); Williams, 689 F.2d at 1376; see Wilson, --- U.S. at ----, 111 S.Ct. at 2326-27; Jones v. Diamond, 636 F.2d 1364, 1374 (5th Cir.) ("When prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners and the level of violence has become so high ... it constitutes cruel and unusual punishment...."), cert. dismissed, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), and overruled on other grounds by International Woodworkers of Am. v. Champion Intern. Corp., 790 F.2d 1174 (5th Cir.1986);[18] Gates v. Collier, 501 F.2d 1291, 1308-10 (5th Cir.1974).
 
 2.
 
 30
 Second, the plaintiffs must show the defendant's deliberate indifference to the conditions. The Supreme Court recently held that the Eighth Amendment contains a subjective component: whether the defendant wantonly permitted the constitutionally infirm condition to persist. Wilson, --- U.S. at ----, 111 S.Ct. at 2323; see also Gamble, 429 U.S. at 104, 97 S.Ct. at 291. In prison condition cases, "deliberate indifference" constitutes wantonness. Wilson, --- U.S. at ----, 111 S.Ct. at 2327.
 
 
 31
 To be deliberately indifferent, a prison official must knowingly or recklessly disregard an inmate's basic needs so that knowledge can be inferred. Duckworth v. Franzen, 780 F.2d 645, 652 (7th Cir.1985), cert. denied, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Because the Eighth Amendment requires a subjective standard, to demonstrate an official's deliberate indifference, a plaintiff must prove that the official possessed knowledge both of the infirm condition and of the means to cure that condition, "so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." Duckworth, 780 F.2d at 653. Thus, if an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he cannot be deliberately indifferent unless he knows of, but disregards, an appropriate and sufficient alternative.[19]
 
 
 32
 In this case, the plaintiffs presented incident reports, internal staff reports, and reports by external investigators each supporting a finding that Turner knew that an unreasonable risk of violence existed at GCI and knew of alternative means that would have brought that risk to within constitutional norms.[20] For example, a January 30, 1980 Palm Beach County Grand Jury Presentment identified evidence of "lax security precautions," and recommended procedural changes in light of "accusations of drugs, alcohol, and other contraband, gambling, theft, confiscation, and payoffs among the inmates and personnel of GCI." Similarly, an external management review of GCI conducted from August 26 to 29, 1980, concluded that "[t]he assault trend, both inmate on inmate and inmate on staff, from July 1979, through June 1980, has increased." Finally, Turner's July 16, 1981 letter to his superiors evidenced his knowledge of a lack of
 
 
 33
 control of the operation of the institution.... Many of the officers that we have assigned to very sensitive security posts are so inexperienced or else have so little capability in this business that they simply do not realize the seriousness of dealing with the type of personnel that we are receiving.
 
 
 34
 The plaintiffs' evidence painted a dark picture of life at GCI; a picture that would be apparent to any knowledgeable observer, and certainly to an official in Turner's position.[21] An inference can be drawn from this evidence that Turner did know that GCI failed to provide inmates with reasonable protection from violence.
 
 
 35
 Mere knowledge of the infirm conditions persisting at GCI does not establish deliberate indifference. The plaintiffs must also demonstrate that, with knowledge of the infirm conditions, Turner knowingly or recklessly declined to take actions that would have improved the conditions.
 
 
 36
 Turner points to evidence of his actions to improve safety conditions at GCI to illustrate his affirmative efforts to improve the conditions of confinement there. Turner testified that he attempted to secure additional funds, make improvements to GCI's physical plant, expand recruitment efforts, and institute policies that would have reduced the risk of violence if his staff had followed them.[22] Turner argues that he was unable to ameliorate further the unsafe conditions at GCI; he did all he could within the budgetary constraints he faced, and, therefore, was not deliberately indifferent.
 
 
 37
 In rebuttal, the plaintiffs presented evidence (1) that Turner failed to ensure that his direct subordinates followed the policies he established, and (2) of specific, low-cost actions that Turner could have taken and that his successors successfully undertook. This evidence supports a finding that Turner knowingly "fail[ed] adequately to supervise correctional officers up to the lieutenant level[,] result[ing] in corruption and incompetence among the officers and a lack of reasonable protection of inmates." LaMarca, 662 F.Supp. at 665; see Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.1991) (suggesting that inadequate staffing may rise to deliberate indifference as to prisoner safety (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980, cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981))); cf. Jordan v. Gardner, 986 F.2d 1521, 1530 (9th Cir.1993) (en banc) ("It is simply not enough to say ... that [the official] gave the issue a great deal of thought. The 'sufficiently culpable state of mind' necessary to find deliberate indifference has more meaning than that.").
 
 
 38
 Determining whether Turner otherwise lacked the means to correct GCI's failure adequately to protect inmates requires a more detailed analysis. In Williams, we held that an official "may not escape liability solely because of the legislature's failure to appropriate requested [and necessary] funds." 689 F.2d at 1387.[23] Where, as here, the lack of funds contributed to the condition, the plaintiffs must "demonstrate that a particular defendant [nevertheless] had the capability (authority and means) to provide adequate security and did not do so." Id. at 1389.
 
 
 39
 To circumvent Turner's "insufficient funds defense," the plaintiffs presented evidence of Turner's capacity, within budgetary constraints, to improve prison safety. We agree with the district court that the plaintiffs' evidence supports the findings that Turner could have, but did not, take steps to minimize at least the following problems at GCI:
 
 
 40
 (1) improper and inadequate staff training ..., (2) a staff out of control who did not report rapes, assaults, and illegal activities up through the chain of command, (3) [Turner's] failure to supervise staff and administer measures which would "minimize the chance of error and maximize the full satisfaction of constitutional protection," in (i) not stationing officers to patrol throughout the dormitories, particularly at night, and leave the wicket cage, and in (ii) permitting the obscuring of vision of the officers in the wicket by allowing inmates to hang sheets ..., (4) [Turner's] shocking failure to employ any standard procedure to investigate incidents of alleged rapes, [ (5) ] [Turner's] failure to provide inmate movement controls thus reducing the casual egress and ingress of aggressive assailant wolves within the open dormitories, and [ (6) ] [Turner's] failure to transfer know[n] assailants or inmates who should have been known to be assailants out of GCI.
 
 
 41
 LaMarca, 662 F.Supp. at 708 (citations omitted).
 
 
 42
 Consideration of such evidence comes perilously close to second-guessing the difficult choices that prison officials must face and of improperly extending deliberate indifference standards to mere "inadvertence or error[s] in good faith." Wilson, --- U.S. at ----, 111 S.Ct. at 2324 (citing Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)). Nevertheless, such evidence is probative of the means available to Turner and must be considered. This evidence directly addresses the question of whether monetary restraints frustrated Turner's good faith efforts, or whether he knowingly or recklessly disregarded solutions within his means.[24] While much of the record indicates that Turner did make good faith efforts to resolve the dilemmas facing GCI,[25] the evidence does support the plaintiffs' position that Turner recklessly disregarded the necessary means to protect inmate safety.
 
 3.
 
 43
 Third, section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." Williams, 689 F.2d at 1380 (citing Monell v. Department of Social Servs., 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)); Redman v. County of San Diego, 942 F.2d 1435, 1439 (9th Cir.1991) (en banc) (requiring an act or omission causing the constitutional deprivation), cert. denied, --- U.S. ----, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). Section 1983 thus focuses our inquiry on whether an official's acts or omissions were the cause--not merely a contributing factor--of the constitutionally infirm condition.
 
 
 44
 "A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation." Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir.1986). Because the analysis focuses on the defendant's conduct, the doctrine of respondeat superior does not apply. Whether a defendant actually controls, or fails properly to supervise a subordinate, however, may prove to be relevant inquiries. See Rizzo, 423 U.S. at 375-76, 96 S.Ct. at 606.
 
 
 45
 If a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is "precluded from contending that the unconstitutional condition was not at least a proximate cause of ... injuries" that arose from that condition. Williams, 689 F.2d at 1389. This is not to say that a plaintiff need not show a causal link between the constitutionally infirm condition and the alleged injuries. Rather, the finding that a prison condition offends the Eighth Amendment presupposes the distinct likelihood that the harm threatened will result. The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries, here the injuries brought about by the assaults.
 
 
 46
 In Doe v. Sullivan County, 956 F.2d 545 (6th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992), the Sixth Circuit addressed causation under section 1983 arising from allegations of "systematic deficiencies" in a prison's protection of inmates similar to those in the instant case. The plaintiff presented evidence of overcrowding, dark cells, insufficient staff, lack of mental and physical evaluations, and inadequate surveillance. Id. at 550. Additionally, a penological expert testifying for the plaintiff concluded that there was a pattern of violence among inmates at the prison and that because of the plaintiff's slight build and mental disability, prison officials should have placed him in protective custody. Id. at 549. In reviewing the sufficiency of the evidence to show causation, the Sixth Circuit concluded "that more is required than [a] naked assertion that the assault would not have occurred but for the offensive conditions. To hold otherwise would effectively transform the causality requirement from a substantive element of proof into one of pleading." Id. at 550. In this case, the plaintiffs presented evidence to support their allegations that Turner "was in a position to take steps that could have averted" the alleged unconstitutional condition at GCI, "but, through [deliberate] indifference, [he] failed to do so." Williams, 689 F.2d at 1384.
 
 
 47
 The plaintiffs presented evidence supporting five conditions of confinement that were under Turner's control and that together created an unconstitutional risk of violence at GCI: (1) a "prevalence of ... weapons" at GCI, (2) the lack of adequate patrols, (3) the lack of adequate reporting procedures for rapes and assaults, (4) the presence of "obvious and rampant indicia of homosexual activity," and (5) a lack of supervision of officers leading to corruption and incompetence. LaMarca, 662 F.Supp. at 664-65. The evidence supports the plaintiffs' assertion that Turner could have brought GCI within constitutional norms through more diligent supervision of his officers, by establishing and enforcing rules and procedures to eliminate specific sources of danger to prisoners, and through low-cost modifications to GCI's physical plant. In particular, Turner could have taken significant steps to eliminate the highly permissive atmosphere at GCI both as to officers shirking their duties and as to prisoners engaging in extortion, harassment, sexual activity, and sexual and other assaults.
 
 
 48
 As we discussed in part II.A.2., the evidence strongly supports a finding that, even within the constraints he faced, Turner had the means substantially to improve prisoner safety at GCI. This evidence also supports findings that Turner knew that the actions he undertook would be insufficient to provide inmates with reasonable protection from violence, and that other means were available to him which he nevertheless disregarded. Such evidence provides the necessary causal link between Turner and the infirm conditions at GCI.
 
 
 49
 Finally, the evidence shows a link between the unconstitutional conditions and the plaintiffs' injuries. The record supports the district court's finding "that due to [their] very nature as acts of violence, the rapes that occurred are not isolated incidents of sexual conduct, but rather flow directly from the lawless prison conditions at GCI.... [These conditions created] the background and climate which ... preordained homosexual rapes and other inmate assault[s]." LaMarca, 662 F.Supp. at 687. The evidence thus permits a finding of a causal link between the objectively intolerable conditions at GCI and the plaintiffs' injuries.
 
 B.
 
 50
 Having determined that the plaintiffs presented sufficient evidence to establish liability on their damages claims against Turner, we turn to Turner's specific challenges to the legal standard the district court employed in assessing liability. Turner contends that the district court clearly erred in its analysis of (1) his deliberate indifference to the constitutionally infirm injury producing conditions, and (2) causation. We disagree.[26]
 
 1.
 
 51
 Turner challenges the district court's finding that he knew of several problems at GCI that contributed to the constitutionally infirm conditions.[27] He argues that without this finding, the district court might not have concluded that he knew of the infirm conditions and thus that he had been deliberately indifferent to the plaintiffs' safety.[28]
 
 
 52
 Turner points to specific language in the district court's opinion indicating that the court applied a negligence standard to determine his knowledge of the infirm conditions and the problems that caused them. For instance, in its discussion of Turner's indifference to prisoner safety, the court stated that "[a] section 1983 plaintiff must prove either that the official knew or should have known that his action infringed a clearly established constitutional right of the plaintiff, regardless of the officials' subjective intent...." LaMarca, 662 F.Supp. at 663 (emphasis added) (internal quotations and citations omitted); see also id. at 658, 678-79 (relying on knowledge "discernable to any prudent prison administrator"). In light of Wilson, which has clarified that a subjective standard must be applied to Eighth Amendment claims, the district court's resort to such an objective standard was erroneous.
 
 
 53
 The court also erred by inquiring as to Turner's knowledge during the "relevant time period of Plaintiffs' damage claims," instead of making a directed inquiry into Turner's knowledge at the time of each incident. See, e.g., LaMarca, 662 F.Supp. at 708-09 ("Plaintiffs' claims are not isolated incidents. They stem from a far ranging and serious failure of Defendant Turner to properly manage[ ] GCI."). The alleged assaults occurred over a three-year period, and, as one would expect, Turner's knowledge ripened during this period. The district court failed to determine properly whether Turner possessed the requisite knowledge at the time of each incident.
 
 
 54
 As we have already discussed, the evidence as a whole, and, in particular Turner's July 16, 1991 letter, provide strong support for the court's ultimate conclusion that Turner knew of the pervasively and obviously unsafe conditions at GCI. The district court, however, did not rely solely on such evidence. We therefore cannot conclude as a matter of law that Turner had a sufficient awareness of the infirm conditions to satisfy Wilson 's subjective standard. Thus, while sufficient evidence exists upon which to find knowledge of the conditions, see supra part II.A, the court must reconsider its findings as to whether Turner had knowledge of or recklessly disregarded the constitutionally infirm conditions at the time of each incident.
 
 2.
 
 55
 Turner also challenges the court's findings as to causation, i.e., whether his deliberate indifference caused the alleged constitutionally infirm condition, and whether the condition caused the assaults. The district court incorrectly stated that an official must "accomplish[ ] what [can] be accomplished within the limits of his authority." LaMarca, 662 F.Supp. at 664 (citing Williams, 689 F.2d at 1388). As our discussion of Turner's deliberate indifference and causation indicates, see supra parts II.A.2 & 3, merely showing that an official had the means to correct a constitutional infirmity will not suffice. For the plaintiffs to demonstrate the requisite causal nexus, Turner must not only have had the means to correct the alleged constitutional infirmities, but also must have at least recklessly disregarded the inadequacy of the approach he took, the availability of other approaches, and their capacity to provide a cure. As we have already noted, it is, after all, " 'obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause....' " Wilson, --- U.S. at ----, 111 S.Ct. at 2324 (quoting Whitley, 475 U.S. at 319, 106 S.Ct. at 1084) (citations omitted; internal quotations omitted; emphasis omitted); cf. Fernandez v. United States, 941 F.2d 1488, 1494 (11th Cir.1991) ("To establish a valid eighth amendment claim, 'a prisoner must allege acts or omissions sufficiently harmful to evidence [the] deliberate indifference [of prison officials]....' " (quoting Gamble, 429 U.S. at 106, 97 S.Ct. at 292)). This approach ensures that we do not question the direction taken by officials in performing the complex and arduous task of running prisons. See Preiser v. Rodriguez, 411 U.S. 475, 492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973) ("Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems."). Thus, we must revisit our analysis of Turner's subjective intent to ensure that only evidence probative of causation in the Eighth Amendment context will be considered.
 
 
 56
 The district court did not identify the potential solutions that Turner actually or recklessly disregarded. Additionally, the court's causation inquiry was not circumscribed by the knowledge Turner possessed at the time of each alleged assault, a particularly important consideration since the district court found that conditions slowly, but continuously, improved during Turner's tenure as superintendent. Instead, the court assumed that Turner actually knew, or should have known, of these measures. Thus, even though the plaintiffs' evidence supports a finding of causation, see supra part II.A.3, the court's finding that the solutions available to Turner were sufficient may have erroneously charged him with an Eighth Amendment duty he did not have. The court must, therefore, reconsider the issue of causation and determine whether Turner knowingly or recklessly disregarded any corrective measures. If he did, the court must then determine whether, taken as a whole, these measures would have eliminated the infirm conditions for which he was responsible.
 
 III.
 
 57
 We now shift our focus from the retrospective analysis of the plaintiffs' damages claims against Turner to the prospective relief sought by the class of present and future inmates of GCI. Three challenges to the court's order granting injunctive relief merit discussion: (1) the conditions at GCI had improved, and, therefore, injunctive relief was no longer required, (2) Lambdin, GCI's current superintendent, had not been deliberately indifferent to prisoner safety, and (3) the district court's equitable grant unnecessarily intruded upon GCI's management.
 
 A.
 
 58
 First, Lambdin argues that because GCI reasonably protected inmates from violence at the time of trial, the court erred in granting injunctive relief. We disagree. Subsequent events, such as improvements in the allegedly infirm conditions of confinement, while potentially relevant, are not determinative. When a defendant corrects the alleged infirmity after suit has been filed, a court may nevertheless grant injunctive relief unless the defendant shows that absent an injunction, the institution would not return to its former, unconstitutionally deficient state. Jones, 636 F.2d at 1375; Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Comm'rs, 622 F.2d 807, 822 (5th Cir.1980) (finding that "the defendant [must] demonstrate that there is no reasonable expectation that the wrong will be repeated" (internal quotations omitted)), cert. denied, 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981). We have held that
 
 
 59
 [j]urisdiction may abate if there is no reasonable expectation the alleged violations will recur and if intervening events have completely and irrevocably eradicated the effects of the alleged violations. To defeat jurisdiction on this basis, however, defendants must offer more than their mere profession that the conduct has ceased and will not be revived.
 
 
 60
 Hall v. Board of School Comm'rs, 656 F.2d 999, 1000-01 (5th Cir. Unit B 1981) (citations omitted). The burden is thus "a heavy one." United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).
 
 
 61
 The district court, in the damages phase of the case, found that GCI failed to provide inmates with reasonable protection from violence. On appeal, Lambdin has not challenged this determination, but has instead relied on GCI's elimination of the infirm conditions to defeat the court's grant of injunctive relief.[29] The district court, however, concluded that Lambdin had not taken sufficient steps to ensure that GCI's past wrongs would not be repeated. The record supports this finding. It was, therefore, appropriate for the court to consider granting the plaintiffs' request for injunctive relief.
 
 B.
 
 62
 Second, relying on the court's observation that Lambdin "appears to be a dedicated public servant who is trying very hard to make GCI an efficient and effective correctional institution," Lambdin argues that the court erred in ordering injunctive relief. In essence, he asserts that the court should have focused on his deliberate indifference, instead of the institution's historical indifference. The Supreme Court in Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), explained the significance of suits against state officials in their official capacities:
 
 
 63
 Official-capacity suits ... "generally represent only another way of pleading an action against an entity of which an officer is an agent." As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.
 
 
 64
 Id. at 165-66, 105 S.Ct. at 3105 (citations omitted); see also Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." (citing Brandon v. Holt, 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985))); Owens v. Fulton County, 877 F.2d 947, 951 n. 5 (11th Cir.1989). Thus, while changes in circumstances may change the nature of, or necessity for, injunctive relief, substitution of Lambdin as the named official does not bar such relief. See Graham, 473 U.S. at 166 n. 11, 105 S.Ct. at 3105 n. 11.
 
 C.
 
 65
 Third, Lambdin challenges the scope of the district court's order. We must therefore determine whether the relief granted by the court squares with the alleged harm. The court's order dealt with three conditions of confinement: (1) GCI's protection of inmates, (2) conditions in protective confinement, and (3) counseling of rape victims. The later two conditions, although tangentially related to prisoner safety, required a separate constitutional foundation. We address each below.
 
 1.
 
 66
 We have so far assumed, as the parties have, that at the time of the second trial (on the claim for injunctive relief), GCI provided inmates with reasonable, and constitutionally adequate, protection from violence. Although the district court did not reach this issue, we are satisfied, after reviewing the record, that this assumption is correct.
 
 
 67
 Absent an existing constitutional violation, the district court's power to grant equitable relief was limited to ensuring that GCI continued to provide inmates with adequate protection. Cf. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("[T]he nature of the violation determines the scope of the remedy.") While district courts have broad discretion to fashion equitable relief, such relief must target the existing wrong. Milliken v. Bradley, 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977) ("[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation...."). Here, the wrong was the risk that GCI would once again disregard the safety of its inmates.
 
 
 68
 In Jones, we considered the appropriate form of relief when, during the pendency of the court's proceedings, the defendants cured the constitutionally infirm conditions alleged by inmate-plaintiffs. We stated that
 
 
 69
 Judges are neither correctional officers nor penologists. Even if we had the expertise to analyze the practical and theoretical implications of the conditions of incarceration, we would have no warrant to impose our views, for a legislature--state or federal--is not required by the Constitution to operate penal institutions in accordance with criminological doctrine or to employ only experts in their management.... Moreover, we are aware that we should not, "in the name of the Constitution, become ... enmeshed in the minutiae of prison operations."
 
 
 70
 636 F.2d at 1368 (quoting Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1974)). In keeping with the mandate of Bell v. Wolfish, we prescribed only general constraints designed to ensure that the prison would continue to operate in a constitutional manner.
 
 
 71
 In this case, the district court ordered Lambdin to maintain policies requiring (1) that the dorms and confinement areas be regularly patrolled and that patrols have clear views of the relevant areas, (2) the use and maintenance of metal detectors, (3) regular shakedowns, and (4) the disciplining of prisoners found in possession of contraband. These aspects of the court's order, while not comprehensive, target GCI's potential to slacken its efforts to protect its inmates.
 
 
 72
 To effectuate its prescribed policies, however, the court also ordered Lambdin to discipline his guards, detailing the type of sanctions and the conditions under which they should be employed. We find that this unnecessarily intrudes on GCI's operations. See Bell, 441 U.S. at 547, 99 S.Ct. at 1878; Rhodes v. Chapman, 452 U.S. 337, 351, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981). The court should have "accorded wide-ranging deference in the adoption and execution of policies and practices that in [the prison official's] judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547, 99 S.Ct. at 1878. It was sufficient that the court enjoined Lambdin to ensure that the specific policies were carried out. Going beyond this to restrict the methods by which Lambdin effectuated these policies was an inappropriate use of the court's equity powers.
 
 2.
 
 73
 The district court's injunctive order also addressed conditions in protective confinement. The court determined that during Turner's tenure, conditions in protective confinement were punitive in nature. By the time of the second trial, however, this was no longer the case. The court, therefore, should have limited its order to ensuring that the conditions continued to conform with Eighth Amendment standards. Instead, the court fine-tuned the existing conditions by (1) eliminating double-bunking, (2) precluding stays in protective confinement in excess of thirty days, (3) requiring the transfer of inmates in protective confinement who could not be returned to the general prison population, and (4) ensuring that the lighting in protective confinement conforms to American Correctional Association guidelines.[30] The conditions targeted here, whether taken singularly or together, do not constitute cruel and unusual punishment and do not ensure that the prior infirm conditions will not recur. See Wilson, --- U.S. at ----, 111 S.Ct. at 2327 (Separate failures of prison administration designed to protect inmates "may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need...."). We, therefore, vacate the district court's injunction and remand the claim for injunctive relief so that the court may determine whether an injunction is necessary to ensure the continuance of currently constitutionally adequate conditions in protective confinement.
 
 3.
 
 74
 Finally, the district court ordered psychological counseling of rape victims. The court found that GCI unnecessarily and wantonly inflicted pain upon prisoners by failing to provide them with post-rape psychological or psychiatric counseling. This aspect of the court's injunction was based on independent findings of fact that inmates are systematically denied access to such treatment, cf. Harris, 941 F.2d at 1505, and that such denials constitute deliberate indifference to a serious medical need, see Gamble, 429 U.S. at 104, 97 S.Ct. at 291; Greason v. Kemp, 891 F.2d 829, 834 (11th Cir.1990). These findings are well supported by the record. The court enjoined Lambdin to (1) provide training to all prison guards in the handling of rape complaints, (2) require special training for the staff psychiatrist and the staff psychologist, and (3) "promulgate an official referral procedure for all rape victims to the resident psychiatrist or psychologist for evaluation." We affirm these aspects of the injunction.
 
 IV.
 A.
 
 75
 Turner appeals the district court's ruling that he waived his Seventh Amendment right to jury trial as to the new plaintiffs' claims.[31] See Fed.R.Civ.P. 38(b), (d). The right to "trial by jury is a vital and cherished right, integral in our judicial system," City of Morgantown v. Royal Ins. Co., 337 U.S. 254, 258, 69 S.Ct. 1067, 1069, 93 L.Ed. 1347 (1949), and a waiver of this right must be meaningful, In re Zweibon, 565 F.2d 742, 746 (D.C.Cir.1977) (Rule 38 was not "intended to diminish" the constitutional right to a trial by jury in civil cases, "and should be interpreted, where possible, to avoid giving effect to dubious waivers of rights."). Moreover, "as the right of jury trial is fundamental, [we must] indulge every reasonable presumption against waiver." Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 811-12, 81 L.Ed. 1177 (1937); Borgh v. Gentry, 953 F.2d 1309, 1311 (11th Cir.1992) ("[A] court's discretion [to deny a jury trial] is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510, 79 S.Ct. 948, 956, 3 L.Ed.2d 988 (1959))). We therefore review the district court's denial of a jury trial with "the most exacting scrutiny." City of Morgantown, 337 U.S. at 258, 69 S.Ct. at 1070. Unless the error is harmless, we must reverse judgments founded upon an unconstitutional denial of a jury trial. Western Elec. Co. v. Milgo Elec. Corp., 573 F.2d 255, 257 (5th Cir.), cert. denied, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978).
 
 
 76
 The Federal Rules of Civil Procedure provide that "[t]he right to trial by jury as declared by the Seventh Amendment to the Constitution ... shall be preserved to the parties inviolate." Fed.R.Civ.P. 38(a). A party may, however, waive this right by failing to make a timely demand upon the courts. Under Rule 38, as to "any issue triable of right by a jury," waiver occurs ten days after "service of the last pleading directed to such issue." Fed.R.Civ.P. 38(b), (d); see Guajardo v. Estelle, 580 F.2d 748, 752-53 (5th Cir.1978). Such waivers apply only to the issues raised by the pleadings; subsequent amendments to the pleadings can raise "new issues" for which the right to a jury remains.
 
 
 77
 In this case, Turner did not demand a jury trial within ten days of his answer to the first amended complaint. He therefore waived his right to jury trial as to issues raised in that complaint. He argues, however, that he did not waive his right to jury trial as to the new plaintiffs' claims.
 
 
 78
 The district court, in rejecting Turner's demand for a jury trial, concentrated on Rule 38's use of the term "issue," which the court noted refers to those issues "raised in the original complaint." LaMarca, 662 F.Supp. at 652; Rosen v. Dick, 639 F.2d 82, 94 (2d Cir.1980) ("[T]he term 'issue' means something more than the evidence offered and the legal theories pursued.... [One must ask whether] the ultimate issue for decision is different."). The court concluded that no new issues were raised by the amended pleadings and struck Turner's jury demand.
 
 
 79
 The district court's approach illustrates the difference between the jury's role in resolving specific factual issues, and the application of such determinations to legal theories. Guajardo, 580 F.2d at 753. New facts that "merely clarif[y] 'the same general issues' raised in the original complaint" do not create new issues of fact upon which to assert a jury demand. Lanza v. Drexel & Co., 479 F.2d 1277, 1310 (2d Cir.1973) (en banc) (quoting Moore v. United States, 196 F.2d 906, 908 (5th Cir.1952)); id. (The "underlying facts and basic legal theory [must be] changed by the amendments" in order to create new issues.). Amendments to pleadings thus may contain new facts which do not create new issues triable by a jury. Id.
 
 
 80
 These basic principles for identifying new issues were developed in cases where all relevant parties were before the trial court at the time of the initial waiver. In such cases, a trial court applies these principles to determine the extent of a demanding party's prior waiver. In this case, however, the second amended complaint added seven new plaintiffs permissively joined under Fed.R.Civ.P. 20(a).[32] Each new plaintiff asserted an individual claim for damages arising from a separate incident at GCI. Moreover, the incidents alleged by three of the new plaintiffs (Cobb, Durrance, and Aldred) had not occurred at the time Turner waived jury trial as to the issues raised by the first amended complaint. Turner asserts that waivers under Rule 38 do not apply in such circumstances. We agree.
 
 
 81
 The plaintiffs do not directly address whether the district court's approach of identifying new issues provides the proper analysis when newly joined parties raise unique claims. Instead, they tenaciously argue (as they successfully did below) that all issues raised in the second and third amended complaints arose from the same "general area" of dispute or involve the "same matrix of facts" identified in the first amended complaint. See Lanza, 479 F.2d at 1310. Thus, they contend that the second and third amended complaints do not raise new issues revitalizing Turner's right to jury trial.[33]
 
 
 82
 Underlying the plaintiffs' resistance to Turner's jury demand is their mistaken belief that this case involved only "one prison civil rights suit under 42 U.S.C. § 1983." This case involved eleven separate actions: ten independent damages actions and one class action for injunctive relief. Each of these actions raised distinct factual issues. Turner was not "put on notice [as to these claims] by the original round of pleadings in this case." Cedars-Sinai Medical Ctr. v. Revlon, Inc., 111 F.R.D. 24, 30 (D.Del.1986). All he could have anticipated at the time of his waiver was that evidence of the incidents underlying the new plaintiffs' claims might be presented at trial. Even under its analysis, the district court erred by striking Turner's jury demand.[34]
 
 
 83
 Turner raises an alternative approach to analyzing his right to jury trial which determines which issues must, on remand, be tried before a jury. He observes that if the new plaintiffs had brought separate suits, an effective waiver under Rule 38 in one suit would not extend to the others. Under the district court's approach, however, permissive joinder provides a means to bypass a party's right to jury trial, thus making this fundamental right contingent upon the procedural mechanism through which a claim comes before a trial court. When such processes are within the sole control of one side of a dispute--here the plaintiffs--and subject only to the discretion of the trial court, application of the Federal Rules cannot extirpate a party's constitutional right to jury trial.
 
 
 84
 In this case, three and one-half years after LaMarca filed his pro se complaint, and only two months before trial, Turner demanded a jury trial as to all issues raised in the new plaintiffs' claims. The plaintiffs stress these dates as indicative of the frivolousness of Turner's position. Yet, the plaintiffs created this issue by seeking to join the new plaintiffs in the heat of trial preparation, and then insisting that Turner relinquish his right to present his case to a jury. Turner objected to the joinder of the new plaintiffs and stressed his intent to demand a jury trial on all issues raised by the new claims. Nevertheless, the court permitted joinder of the new claimants, and did so without preserving Turner's right to a jury trial. Turner's right to a jury trial thus fell victim to the trial court's discretionary decision to permit joinder of the new claimants.[35] Notwithstanding any common thread that may have existed between the original and amended complaints, even if to a "sickening proportion," LaMarca, 662 F.Supp. at 653, we cannot sanction such a result. We hold, therefore, that Turner was entitled to a jury trial as to the new plaintiffs' claims.[36]
 
 B.
 
 85
 Turner argues that his right to jury trial as to the new plaintiffs' claims trumps his waiver as to common issues raised by the original plaintiffs' claims,[37] see In re Kaiser Steel Corp., 911 F.2d 380, 388 (10th Cir.1990) (holding, in case with multiple parties, that waiver of common issue does not occur until ten days following the last pleading by any party), and therefore that he is entitled to a jury as to all claims. Turner concedes, however, that he knowingly waived his right to a jury as to the original plaintiffs' claims. Without a constitutional underpinning upon which to rest, Turner must demonstrate that the district court erred in its application of Rule 38 and that he was harmed by this error. Cf. id. (holding amendments to pleadings do not revive the right to jury trial as to issues already framed). Because he has not done so, Turner's initial waiver as to the original plaintiffs' claims remains effective.
 
 V.
 
 86
 Turner next appeals (1) the district court's refusal to continue the December 2, 1985 trial; (2) the court's refusal following the trial to consider, as part of the trial record, several depositions taken during and shortly after the trial; and (3) the court's refusal to reopen the record of the trial to receive some additional evidence Turner obtained while the first appeal (of the damages awards) was pending in this court. We review these rulings for abuse of discretion. Connecticut Gen. Life Ins. Co. v. Breslin, 332 F.2d 928, 932 (5th Cir.1964).
 
 
 87
 As indicated earlier, after the plaintiffs filed their second amended complaint (which added seven plaintiffs to the case) on August 26, 1985, the defendants moved for a continuance of the trial which had been set for November 4, 1985. The district court granted their motion on November 10, continuing the trial until December 2. The defendants wanted more time for discovery and to prepare for trial; we cannot say, however, that the court abused its discretion in giving them the extra time allotted. See Edward Leasing Corp. v. Uhlig & Assocs., 785 F.2d 877, 881-82 (11th Cir.1986); Menendez v. Perishable Distribs., Inc., 763 F.2d 1374, 1379 (11th Cir.1985).[38]
 
 
 88
 The defendants renewed their motion for a continuance on November 13, stating that they would not be able to complete their discovery by the scheduled trial date. According to the defendants, they needed to depose several witnesses who had been identified by the new plaintiffs when the defendants took their depositions. Whatever may have been the defendants' need for a continuance at that time, the need increased when, as the trial was about to begin, the district court gave the plaintiffs leave to file their third amended complaint adding Billy Joe Harper's damages claim.
 
 
 89
 Believing that Harper's claim raised no new issues, and thus created no need for additional discovery, the district court refused to grant a continuance. The court's belief was unfounded; Harper's claim raised several new issues requiring discovery. See supra note 34. After the trial began, the magistrate judge apparently had second thoughts about the defendants' need for a continuance; he permitted them to take discovery depositions both during and after the trial with the understanding that these depositions could be made a part of the trial record at a later date. The defendants accepted this arrangement, evidently believing that it would eliminate any prejudice the denial of the continuance otherwise might have occasioned. Given this acceptance by the defendants, we find that the defendants effectively waived their objection to the December 2 trial date.
 
 
 90
 The trial of the damages claims against Turner ended on December 16, 1985. That day, the magistrate judge instructed counsel to file their proposed findings of fact and conclusions of law by December 23, and scheduled oral argument for December 27. Oral argument was held that day, and the magistrate judge indicated in his report to the district court that he would find for the plaintiffs. On January 8, 1986, the plaintiffs moved the magistrate judge to exclude from the record seven depositions that defendants had taken with the permission of the plaintiffs and the court. Plaintiffs' counsel argued that the depositions should be excluded because the defendants had denied counsel access to the deponents' prison records and thus a meaningful opportunity to cross-examine the witnesses. The magistrate judge granted the motion, and the district court, after considering the magistrate judge's report and recommendation, affirmed.
 
 
 91
 In his brief to us, Turner does not explain how the exclusion of the seven depositions from the record prejudiced his case. Accordingly, Turner has shown no abuse of discretion.
 
 
 92
 Finally, while the district court's disposition of the plaintiffs' damages claims was before us on appeal, Turner's counsel searched for evidence to rebut Dr. Swanson's testimony as to the conditions prevailing at GCI during Turner's tenure.[39] They uncovered documentary evidence that, Turner represents, undermines the court's findings.[40] After we dismissed the first appeal and returned the case to the district court, Turner moved the court to "reopen" the record of the damages trial and consider the new evidence. The court, believing that it lacked jurisdiction to do so, refused.[41]
 
 
 93
 The district court plainly had the authority to reopen the record and to consider the new evidence. The court had such authority at least until, on October 6, 1990, when it entered the final judgment. See Fed.R.Civ.Pro. 59; S.D.Fla.Magis.R. 4(b) (A district court is free to "receive further evidence, recall witnesses, or recommit the matter to the Magistrate Judge with instructions."); La Fever, Inc. v. All-Star Ins. Corp., 571 F.2d 1367, 1368 (5th Cir.1978). Prior to the entry of judgment (and the denial of the defendants' motion for a new trial), the court had the power to revisit the entire case.
 
 
 94
 Since we remand the damages claims of the new plaintiffs for trial before a jury, the district court's action in refusing to consider the new evidence only affects the claims brought by LaMarca, Saunders, and Johnson. Because the court might have considered Turner's new evidence, had it thought it had the power to do so, we instruct the court to consider Turner's proffer. We intimate no view, however, as to whether the court should accept it and reopen the proceedings as to these three plaintiffs.
 
 VI.
 
 95
 Turner retained the right to trial by jury as to the new plaintiffs' claims. We therefore vacate the money judgments for Durrance, Cobb, Bronson, Aldred, and Harper, and remand their claims for a new trial. We remand the judgments favoring LaMarca, Johnson, and Saunders for reconsideration in light of our discussions in parts II and V. We affirm in part, and remand the court's grant of injunctive relief for further proceedings consistent with part III of our opinion. Finally, in light of these holdings, we must vacate the court's attorneys' fees award.
 
 
 96
 IT IS SO ORDERED.
 
 
 
 *
 Honorable Jerre S. Williams, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 As we explain in the text infra, a magistrate judge actually heard the claims; the district court disposed of them after considering de novo the former's report and recommendation
 
 
 [2]
 A more detailed exposition of the facts supporting the plaintiffs' damages claims is set out in the magistrate judge's Report and Recommended Findings of Fact and Conclusions of Law, LaMarca v. Turner, 662 F.Supp. 647, 667-717 (S.D.Fla.1987), which the district court reviewed de novo and adopted in all relevant parts, see id. at 650-667. The court's subsequent order granting injunctive relief was not published
 
 
 [3]
 The court later severed Rosenbaum's claim, and it is not before us
 
 
 [4]
 On April 13, 1984, the district court certified a class of "all those persons who are or will be incarcerated at the Glades Correctional Institution located in Belle Glade Florida." See Fed.R.Civ.P. 23(a), (b)(2)
 
 
 [5]
 Actually, Turner answered the first amended complaint. Lambdin was not made a defendant until he became superintendent of GCI in December 1985. For convenience we refer to Lambdin throughout the opinion as the defendant for the injunctive relief claim
 
 
 [6]
 The district court had referred the case to a magistrate judge to conduct an evidentiary hearing on all claims and to prepare a report and recommendation. See S.D.Fla.Mag.J.R. 1(f). We refer to this hearing as the "trial" or the "damages trial."
 
 
 [7]
 The defendants made their jury demand, but did not answer the second amended complaint. Their failure to file an answer became unimportant when, as the following text indicates, the plaintiffs obtained leave to file a third amended complaint. Because the parties, below and on appeal, have assumed that the original jury demand was timely as to the third amended complaint, we do not address whether the demand actually was timely
 
 
 [8]
 We recite the facts explicitly found by the magistrate judge and adopted by the district court. We also recite facts that we consider to have been implicitly found, because they were not in dispute. Since we must vacate and remand the money judgments for the plaintiffs, the district court's findings of fact will not be binding in the subsequent proceedings in this case
 
 
 [9]
 GCI also had an "honor" dorm not relevant in this case
 
 
 [10]
 The acceptance of this condition might be best illustrated by LaMarca's story (taken as credible by the district court) that when he asked a guard for protection, the guard gave him a knife
 
 
 [11]
 In a survey, when GCI's staff were asked, " 'Did you receive instructions or guidelines on the responsibilities and supervisory functions of your job when you became supervisor?,' they answered with a 'resounding no.' " Id. at 674. The Department of Corrections, Office of Inspector General observed that "we fail to understand and appreciate laxity, in some instances, the disregard for established procedures." Id. The court found that when staff engaged in egregious conduct, "so gross that immediate action should have been taken," Turner did not act. Id. at 675. This "underscore[d] the day-to-day operation of GCI with its staff not controlled by Superintendent Turner." Id. at 677
 
 
 [12]
 The court concluded, however, that two plaintiffs, Epprecht and Gordon, had not proven that Turner's deliberate indifference to their need for safety caused their injuries. LaMarca, 662 F.Supp. at 665. Epprecht and Gordon have not appealed
 
 
 [13]
 The court granted monetary awards to Anthony LaMarca, $9,000, Edwin Johnson, $13,000, Eddie Cobb, $6,500, and Martin Saunders, David Aldred, Steve H. Bronson, Ron Durrance, and Billy Joe Harper, each $30,000. LaMarca, 662 F.Supp. at 667, 715
 
 
 [14]
 Lipman was still concerned about the adequacy of the security GCI's staff was providing the inmates, the conditions surrounding the protective confinement cells, the ready availability of counseling for inmates who had been raped, and the presence of contraband, in particular weapons and drugs
 
 
 [15]
 The court cited as evidence of GCI's indifference to this medical need the testimony of GCI's staff psychiatrist, who stated that in his 15 years on the staff he had never been consulted regarding an inmate who had been sexually assaulted
 
 
 [16]
 Section 1983, upon which this action is based, also requires that the defendant act "under color of state law." 42 U.S.C. § 1983. This element is not at issue in this case
 
 
 [17]
 The Supreme Court recently confirmed that the first two elements of an Eighth Amendment claim, the "objective" and "subjective" elements, must both be satisfied. See Hudson v. McMillian, --- U.S. ----, ----, 112 S.Ct. 995, 999-1000, 117 L.Ed.2d 156 (1992)
 
 
 [18]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [19]
 The Seventh Circuit in McGill v. Duckworth, 944 F.2d 344 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992), noted a difference between "when [a state] acts because of [an] effect," in which case the state intends a consequence, and "when it acts in spite of an effect," in which case the state lacks the requisite intent. Id. at 344 (citing Personnel Adm'r v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)). If such a standard were applicable to Eighth Amendment claims, the burden upon plaintiffs would become even more formidable. Yet, the requisite intent for deliberate indifference is unlike that for demonstrating a legislature's discriminatory intent under equal protection jurisprudence, as in Feeney. The McGill court's approach apparently provides officials a safe refuge from liability, much like a bystander is provided at common law. By doing so, the McGill court overlooks the significance of an official's duty not to impose cruel and unusual punishment upon prisoners--a duty firmly established in the Supreme Court's Eighth Amendment jurisprudence. A state--and similarly its officials--can be deliberately indifferent if it acts in spite of a condition violating the objective prong described above unless such actions are justified by countervailing penological objectives
 
 
 [20]
 Turner testified as to additional sources through which he gained knowledge of the conditions at GCI. These included monthly meetings with key staff members, attendance at monthly meetings of each department, regular meetings with prisoner organizations, and his general practice of wandering through the prison compound
 Turner argues that the district court relied on notice created through telephone conversations between Turner and Saunders' mother. See LaMarca, 662 F.Supp. at 696. These conversations arguably showed general indifference on Turners' part toward inmates. Yet, because the conversations occurred after the alleged incidents, they were not relevant to Turner's pre-assault knowledge of unsafe conditions at the prison and were only marginally relevant to his alleged indifference to prisoner safety at the time of the alleged incidents.
 
 
 [21]
 In Rizzo v. Goode, 423 U.S. 362, 375-76, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976), the Supreme Court rejected a plaintiff's § 1983 claim based on pervasive unconstitutional police practices. "[T]he Court disapproved the imposition of liability for the officials' failure to act in the face of a statistical pattern of police misconduct absent proof that the supervisory defendants had 'direct [ ] responsibility for the actions' of those police officers who had engaged in this misconduct." Williams, 689 F.2d at 1381 (quoting Rizzo, 423 U.S. at 375-76, 96 S.Ct. at 606). In this case, the trial court did not rely solely on statistical patterns. Moreover, Turner's supervisory role and the insular character of prison communities provided strong support for the court's conclusion that Turner must have known of these conditions
 
 
 [22]
 Turner generally improved GCI's physical plant, modernized the prison's infirmary, decreased staff overtime, increased the number of confinement cells, and made a significant effort to document incidents at GCI (an effort necessary to proper management and safety). He also appeared before state legislative committees, wrote letters to Secretary Wainwright of the Department of Corrections, and identified the problems at GCI in his monthly reports
 Turner also appears to have made substantial efforts to improve recruiting of staff, a critical problem for GCI during Turner's tenure as superintendent. He testified that he sought to increase salaries (and was minimally successful), acquired a van for staff car-pooling from more distant locations (reducing the staff's transportation expenses), appeared at high school career days, and set up a program with the Florida State Employment Service. To control contraband, he attempted to utilize marijuana-sniffing dogs, but this proved ineffective in light of the confusing effluvium at GCI. The evidence does not indicate whether Turner intended that these actions resolve GCI's problem with prisoner safety.
 
 
 [23]
 In Wilson, the Court declined to address the applicability of an insufficient funds defense. --- U.S. at ----, 111 S.Ct. at 2327
 
 
 [24]
 The district court did not address this point, and, therefore, did not determine whether Turner knew of, or recklessly disregarded, the solutions suggested by the plaintiffs. On remand, the district court must reconsider whether Turner was deliberately indifferent to prisoner safety at the time of each incident for which an award of money damages is sought
 
 
 [25]
 For example, Turner's July 16, 1981 letter suggests a deep concern for, and helplessness regarding, the state of affairs at GCI
 
 
 [26]
 Turner has not challenged the district court's finding that GCI failed to provide inmates with reasonable protection from violence. We therefore assume that the plaintiffs satisfied the Eighth Amendment's objective component as to each incident for which money damages was sought
 
 
 [27]
 On appeal, Turner draws our attention to nine factors identified by the district court as contributing to the unconstitutional conditions at GCI: (1) a lack of weapons training, marginally indicating a more general failure by Turner to train his staff, (2) the staff's failure to report rapes, (3) the staff's failure to report other illegal activity, (4) the staff's failure regularly to patrol dorms, (5) the staff's failure to ensure maximum visibility in the dormitories, (6) the lack of standard procedures for investigating rapes, (7) Turner's failure to avail himself of outside agencies for investigating rapes and assaults, (8) Turner's failure to establish inmate movement controls, and (9) Turner's failure to transfer problem inmates
 
 
 [28]
 This argument conflicts with Turner's earlier contention that he was not deliberately indifferent because he took affirmative steps to improve prisoner safety. Yet, Turner could not actively seek to remedy a situation of which he was unaware. Turner's earlier arguments thus indicate an awareness of the infirm conditions
 
 
 [29]
 On remand, Turner may challenge the district court's findings as to the objective unreasonableness of conditions at GCI at the time of the incidents underlying the original plaintiffs' damages claims. We recognize that this does create a potential for inconsistent findings in the damages and injunctive phases of the case
 
 
 [30]
 The Supreme Court has rejected Eighth Amendment challenges to double-bunking. See Bell, 441 U.S. at 542, 99 S.Ct. at 1875 (rejecting any "sort of 'one man, one cell' principle"). Similarly, the district court's order precluding long-duration stays in protective confinement, and requiring timely transfers of inmates who cannot return to protective confinement, does not address a constitutional violation. See Meriwether v. Faulkner, 821 F.2d 408, 415-16 (7th Cir.), cert. denied, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987)
 
 
 [31]
 The Seventh Amendment preserves, "[i]n Suits at common law, ... the right of trial by jury...." U.S. Const. amend. VII
 
 
 [32]
 The original plaintiffs' motion for leave to file a second amended complaint states that the addition of the new plaintiffs was consistent with Fed.R.Civ.P. 15(a). Since the new plaintiffs' claims raise independent causes of action, however, Fed.R.Civ.P. 20(a) controlled the insertion of these parties into the suit
 
 
 [33]
 The plaintiffs point to, but do not discuss, three cases in which new plaintiffs were added after waiver, but, nevertheless, the right to a jury was not revived. See Commonwealth of Penn. v. Sincavage, 439 F.2d 1133 (3rd Cir.1971); Barr v. Arco Chem. Corp., 529 F.Supp. 1275 (S.D.Tex.1982); Ed Brawley, Inc. v. Gaffney, 399 F.Supp. 115 (N.D.Cal.1975). These cases did not involve a jury demand by a defendant after the joinder of plaintiffs with distinct claims. Rather, each case involved a jury demand by an intervening plaintiff. Sincavage, 439 F.2d at 1134 (requiring plaintiff-intervenor to take case "in the status in which she found it"); Barr, 529 F.Supp. at 1276 ("new plaintiff merely reasserted rights alleged in the original complaint," and was joined to correct prior pleadings); Ed Brawley, 399 F.Supp. at 118 (same rights asserted by original and new plaintiffs). These cases suggest no justification for precluding Turner's jury demand
 
 
 [34]
 The new issues included, at least, (1) whether each assault actually occurred, (2) the damages stemming from such assault, (3) the protection afforded to inmates at the time of each assault, (4) Turner's deliberate indifference to the unconstitutional condition at the time of each assault, and (5) the causal nexus between his indifference and the condition
 
 
 [35]
 Richland v. Crandall, 259 F.Supp. 274 (S.D.N.Y.1966), illustrates another procedural rule, consolidation, which, if improperly applied in the Rule 38 context, can be used to bypass a party's Seventh Amendment right. In Richland, shareholders brought four suits derivatively, individually, and as class actions, against 20 defendants (officers, directors, and corporations) for violations of the Securities Exchange Act. Before consolidation, at least one of the 20 defendants had answered three of the four complaints. Id. at 281 & n. 9. The plaintiffs filed a demand for a jury trial within 10 days of service of the answers to the consolidated complaint by some of the defendants. The defendants in Richland argued that by not making a timely demand for a jury trial after the early answers to the original complaints, the plaintiffs waived their right to a jury as to the issues presented in each of the four original complaints. The court, however, observed that the "[d]efendants ignore[d] the fact that the defendants who answered some of the [original] complaints ... constitute[d] only 3 out of the 20 parties named as defendants in one or more of the underlying complaints and in the consolidated complaint, and that the issue was not joined as to the other 17 defendants until [the answers to the consolidated complaint had been filed]." Id. at 281
 The distinction noted by the Richland court is critical. Even though all claims involved the same transaction and there was substantial similarity of issues, the plaintiffs' Rule 38 jury demand was timely as to the claims by the 17 defendants who had not answered the original complaints.
 We find the Richland court's analysis persuasive. The only relevant distinction between Richland and this case is the procedural mechanism through which the independent claims were joined; in Richland separate suits were filed and then consolidated; in the instant case, plaintiffs sought and obtained leave to join new parties with independent claims.
 
 
 [36]
 The plaintiffs' assertion that the original class action suit for injunctive relief incorporated the potential claims of the new plaintiffs is patently meritless
 
 
 [37]
 Consistent with his other arguments, Turner maintains that the original and new plaintiffs' claims have few, and perhaps only one, common issue: "whether the prison conditions during the time frame relevant to their claims were in violation of the 8th and 14th Amendments."
 
 
 [38]
 We reach this result even though the record indicates that the plaintiffs erroneously represented to the court that they were "ready for trial." In fact, their own expert witnesses were unprepared at the time of the December 2, 1985 trial. Dr. Swanson, for instance, admitted on cross-examination that he bypassed potentially relevant sources of information because of severe time pressures. The district court postponed consideration of the injunction claim because Dr. Swanson was not fully prepared
 The plaintiffs' counsel further skewed the court's perception of the defendants' discovery problems by representing to the court that certain witnesses identified by the new plaintiffs in their depositions were not "actual" witnesses whom Turner might require time to contact. Plaintiffs' counsel stated that "I [have] never seen a deposition taken, particularly prisoners, [in an] inmate setting, where a deponent does not offer under skilled examination, such as defendants' counsel, a name of somebody that was a potential witness to an incident, a name of an alleged perpetrator, a name of somebody in the next cell who may have heard or seen [something]." (It seems apparent that Turner's counsel placed more stock in the credibility of the prisoners' stories than plaintiffs' counsel did.)
 
 
 [39]
 The court's extensive reliance on Dr. Swanson's testimony demonstrates the importance of this witness. Yet, Dr. Swanson did not begin his investigation until after October 4, 1985, and did not complete his interviews with the plaintiffs until December 1, 1985, the day before the damages trial began
 
 
 [40]
 Turner described this evidence, in part, as
 more than 100 investigations were undertaken from 1980-84 ... in respect to sexual assaults, non-sexual assaults and batteries, possession of weapons, possession of drugs or alcohol and introduction of contraband; they reflect that, in virtually all instances, the Palm Beach County Sheriff's office was involved in the investigations; that prosecutions were undertaken; that, in respect to alleged sexual assault, rape kit tests were administered when appropriate; that there was an established procedure for investigation and handling of such claims.
 
 
 [41]
 The court stated that
 [i]f this Court's order was incorrect earlier in that respect in that we denied motions for continuance, and I think there was perhaps more than one of these, why, it seems to me ... that I may not have jurisdiction at this time since an appeal has been taken. [Counsel for Turner] asserts that we still do, and perhaps he is right, but it seems to me it is better to go ahead and stick with that earlier ruling, and let the appellate court review that point as well as this order which I am now making denying the motion....