CLARK, Senior Circuit Judge,
dissenting:
Respectfully, I dissent. I believe the district court was correct in holding that there is a genuine issue of material fact as to whether the defendants were deliberately indifferent. The district court did not err in denying the defendants’ motion for summary judgment.
Adams was convicted in Savannah for being a habitual DUI offender and was sentenced to one year in the Georgia prison system. While awaiting transfer to prison, Adams was hospitalized for a week with chronic asthma. When he reached the Bos-tick Correctional Institution on September 15, his admission sheet reflected that he suffered from chronic asthma and any work assignments should take that into account. Twenty-three days after admission, on October 8, 1989, he died as a consequence of not being properly treated for his asthma. The defendants/appellants were involved in the failure to treat his illness. During the twenty-three days he was seen twice by defendant Dr. Poag who recognized his symptoms of asthma. He was never seen by Dr. Carmichael, who was consulted by telephone by nurses and/or physician assistants. Dr. Carmichael discontinued the one medication which had aided Adams’ asthma prior to his confinement.
Dr. Robert J. DiBenedetto, an internist and specialist in treating pulmonary ailments, testified by deposition. Dr. DiBene-detto was Medical Director of the School of Respiratory Therapy at Armstrong and Medical Director of the Internal Medicine Residency Program at Memorial Medical Center in Savannah. He was furnished Adams’ state prison medical records for review. Following are excerpts from Dr. DiBenedetto’s deposition:
Q: Well, let me do what I don’t want to do. You say you have a general feeling about the standard of medical care that was at this prison based on his records. Tell me what your opinion is generally.
A: The opinion is that this standard of care is inadequate.
Q: I take it that it’s your opinion it doesn’t meet community standards?
A: Absolutely not.
Q: Specifically what areas do you say are inadequate?
A: Well, first of all, let’s take just as in general. People realize that there’s an increasing mortality in asthma. We know it’s in people who have been hospitalized before. We know it’s in people who have *1549 repeated difficulties unresponsive to therapy, and we have an individual here who has been ill for almost a month, who is in and out of the infirmary; and that in and out is a red flag that says do something with this individual; hospitalize him. Put him on corticosteroids, which is the main form of therapy.
He had a seven-day course of corticosteroids, and during that time he got better for a day or two and then got worse. Somebody should have increased his steroids and kept him on them.
Secondly or thirdly there’s a tremendous play on Theophylline in this chart which is now a third line drug. Many of the manipulations of the Theophylline as far as I was concerned was change one preparation for another when in reality the man needed to be, one, hospitalized, and, two, if they didn’t want to hospitalize him, at least he should have been put on high doze (sic) corticosteroids for a protracted period of time.
And I could go on, but when nurses examine you and say patient hyperventilating, he had asthma. That’s why he was breathing that way. We have comments in the chart that the patient is — they allude to him as some type of malingerer, and yet if you follow the course of what’s going on, he’s an asthmatic who was literally yelling out for help; and nobody is listening to him. Each day he has more and more trouble breathing.
We have gaps in the records where he was supposedly to be started on medicine.
A day, day and a half went by with no medicine. To somebody with asthma, that’s a disaster.
On the day of his demise, he was given an injection I believe of Vistaril, which is a sedative. If you look in the literaure (sic), the asthmatics who die, they all die in hospitals basically, the bad ones who die, in the middle of the night when they’re all usually — in the early days, in the 1950s and ’60s — -and I’ve seen some of this stuff in the medical literature — are given sedatives to shut them up, and we didn’t know any better in those days.
But the last entry is he’s gotten some Vistaril. So I think the medicines were inadequate. I think the people who took care of him were not aware of how sick you can get with asthma. I think the nurses were cavalier. I think the PAs were constantly juggling medicines, but they were juggling the same medicines, fooling with a little bit of change of doze (sic) or another brand, and many of the treatments were stopped gap.
There was an injection, a breathing treatment which are just — that’s sort of like the first two steps leaving home plate on the way to first. Then at that point he should have been treated totally different, and they didn’t treat him that way. When I look at this whole picture of a guy yelling out, please, help me. He’s showing up every day or almost every day into the dispensary and who is just getting an extra pill or an injection. That’s not the way you treat asthma.
The way you treat a bad asthma attack and worsening asthma is in the hospital, intravenous corticosteroids; and that is the major treatment nowadays, and this fellow had a very short course and actually worsening while on them because he was given oral steroids in inadequate dozes (sic) when he should have been getting intravenous steroids.
So, you know, you asked me what specifically is bad about it, that’s briefly what’s bad about it. The whole thing is bad. It’s just inadequate care.[1]
******
Q: Now, did you examine the specific liability of Dr. Carmichael, the medical director?
A: Dr. Carmichael has these people working for him. I think that he is not performing his job adequately.
Q: In what regard?
A: These doctors and nurses are incompetent.
Q: Which doctors did you review records from are incompetent?
*1550 A: It’s very difficult to tell because a lot of notes in there are physician’s calls, orders given, and it is exceedingly difficult to know who is doing what to whom.
There is one from Dr. Poag, I believe, P-O-A-G, whose therapy seemed to be adequate but — almost adequate in that she started him on corticosteroids, but there should have been some follow-up in three or four days when he indeed was getting very bad. In addition, she should have had some pulmonary function studies on him, and you don’t need a sophisticated laboratory to do that.
That can be done with simple hand-held devices that are very inexpensive which would allow you to identify a sick asthmatic who’s in danger of getting into real trouble. And those devices are well described in the literature and are in lots of general practitioners’ offices.
Q: What are they called?
A: Spirometers.
Q: Can you spell that for the court reporter?
A: S-P-I-R-O-M-E-T-E-R-S; and
Peak Flow, P-E-A-K F-L-O-W, Meters, M-E-T-E-R-S.
Q: Do you know whether these devices are commonly available in prison institutions?
A: I don’t know.
Q: What did Dr. Poag do? You said she was doing the proper studies, just didn’t follow up right?
A: I think that she should have — when presented with his asthmatic (sic), he had been hospitalized in the past, and he tells her that he can get really quite ill, and she examines him and finds him to be in an asthma attack, I think that some simple pulmonary function testing is in order. And I think then at that point, the cost of therapy with what she did I think was initially adequate, starting him on Predni-sone; but I think a week’s worth and the dozes (sic) that were used were inadequate.
And I can’t tell you how bad he was at that time, but if she’s had some pulmonary function studies, I could tell you. And I go on the basis that she describes him as wheezing, but I’m not sure that it’s severe wheezing or moderate wheezing; and asthmatics can fool you because they can die with no wheezing because they’re not moving any air. So pulmonary function studies would have been very useful. They’re simple to do. You don’t need to be a specialist.
The second thing is maybe at that point, she should have considered putting him in the hospital for intensive intravenous therapy which would have avoided the whole incident because that’s the standard of care.
Now, she chose to treat him medically orally, and I can’t object to that because the doze (sic) of corticosteroids if she had used an adequate doze (sic) — and the only way she would have known what was adequate was to examine this fellow three days later, a couple days after that, and continually adjust his Prednisone until he had a good response because I believe from reading the record, my feeling is having taken care of many asthmatics that this patient probably should have been maintained the entire time on some oral Prednisone.
Q: Is the information that you have about treating asthmatics, is it generally held by medical practitioners?
A: Absolutely.[2]
‡ ifc # * ífí
Q: Why is that unusual, Doctor, to watch a patient with shortness of breath?
A: Because you treat him.
Q: Don’t you monitor the patient?
A: Of course, you do, but you treat him.
Q: Is monitoring a patient a form of treating a patient?
A: No.
Q: It’s not?
A: No; it’s observation.
Q: What form of treatment should he have had?
A: At that point, he should have been transferred on 10/07. He should have *1551 been in the hospital on intravenous corticosteroids, oxygen, and appropriate intravenous Aminophylline.
Q: What date was that?
A: 10/07.
Q: What time of day?
A: 9:15.
Q: Was he, in fact, transferred to the hospital that evening?
A: Yes.
Q: All right.
A: But what care did he get there? What care did he get there? They gave him some Elixophyllin, which is Theophylline which is — he was on plenty already, and that was inadequate; and then they sent him over there, and he winds up getting— if I can find the 10/07 sheet, we can talk about it.
But he comes over there, and they give him some more on 10/07. They give him so (sic) more Theophylline. That’s not what he needs. In fact, too much Theo-phylline can kill you. And they’re pumping him full of Theophylline. I don’t know what his level was, and I’m not even implicating that. I’m just pointing out that it can be dangerous.
And they give him Brethine, which is a drug which is used for asthma which is basically an ancillary drug, and they gave him Actifed which is for people with allergies and has no effect at all on asthma.
Then they give him a breathing treatment, and they give him some Vistaril to sedate him, and then somebody says encourage fluid intake. That’s gone. Nobody really pays much attention to that anymore. And then they go transfer him, I guess, to Rivers at that point or it says admit to infirmary, so you’ll have to tell me what the records are here, but 10/07 admission to infirmary.
And all that treatment, that’s all just running around the busy. There’s no direct approach to this guy. They should have had some pulmonary functions. He should have been on intravenous therapy. He should have been on intravenous corticosteroids. He should have been on intravenous Aminophylline. And what they’re doing is, they’re giving him a little of this and a little of that, and it’s adding up to nothing.
* * * ❖ * *
A: .... That’s where I’m coming from when I say — if you read all these notes, you come away with the feeling that people were just not paying attention to this man.[3]
The majority quite correctly notes that mere differences in medical judgment will not form the basis of a claim under the Eighth Amendment. The excerpts from Dr. DiBenedetto’s deposition quoted above, however, indicate significantly more than a difference in opinion in the proper treatment of severe asthma. Dr. DiBenedetto’s criticism of the treatment given to Adams is multifaceted. He asserts variously that Adams was not given sufficient doses of corticosteroids, that days went by when he received no medication whatsoever, that the changes in medication and dosage were haphazard, that he should have been put on intravenous corticosteroids, and that there was no follow-up after initial treatment proved ineffectual.
The majority’s view of Dr. DiBenedetto’s testimony suggests that there is a conflict in the evidence:
Dr. DiBenedetto’s affidavit and deposition are helpful for what they do not say. Dr. DiBenedetto does not take issue with Dr. Carmichael’s assertion that Brethine, Alu-pent medication, and nebulizer treatments are appropriate medications for treating severe asthma. Instead, he characterizes intravenous steroids as the “major treatment” for severe asthma. Thus, we may infer the existence of other asthma treatments whose efficacy matches intravenous steroids. Of course, this is precisely Dr. Carmichael’s contention, and Dr. DiBene-detto’s deposition concedes as much when he notes that Adams was “given oral steroids in inadequate doses.” Implicit in this statement is the assertion that an “adequate” dosage of the medication Adams *1552 was receiving may have properly treated his condition.[4]
In my view, these are questions best left to the trier of fact. Obviously, the course of treatment prescribed for Adams was ultimately insufficient. That which the majority “infers” and finds “implicit” are precisely the questions which should be put to the jury.
The Supreme Court last defined deliberate indifference in Farmer v. Brennan,[5] where the Court stated:
With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. See e.g., LaMarca v. Turner, 995 F.2d 1526, 1535 (CA11 1993).... It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.[6]
******
Our decision that Eighth Amendment liability requires consciousness of a risk is thus based on the Constitution and orn-eases, not merely on a parsing of the phrase “deliberate indifference.” And we do not reject petitioner’s arguments for a thoroughly objective approach to deliberate indifference without recognizing that on the crucial point (whether a prison official must know of a risk, or whether it suffices that he should know) the term does not speak with certainty. Use of “deliberate,” for example, arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental. Cf. Estelle, 429 U.S., at 105, 97 S.Ct., at 291-292 (distinguishing “deliberate indifference” from “accident” or “inadverten[ce]”). And even if “deliberate” is better read as implying knowledge of a risk, the concept of constructive knowledge is familiar enough that the term “deliberate indifference” would not, of its own force, preclude a scheme that conclusively presumed awareness from a risk’s obviousness.[7]
The majority seriously errs in holding that the medical treatment of Adams does not present a disputed issue of material fact as to whether or not there was deliberate indifference to Adams’ needs. The majority accepts the efficacy of the medical treatment notwithstanding Dr. DiBenedetto’s opinion that what was done was largely wrong and that several known and available medicines and diagnostic techniques were not given or administered. Adams was seen only twice by a doctor during the twenty-three day period and a doctor was not called when he obviously was dying. Whether the indifference which is obvious in this case was reckless or accidental should have been determined by a jury, not by judges from a cold record.

. Deposition of Robert James DiBenedetto, M.D., at 19-23.

. DiBenedetto deposition at 28-31.

. DiBenedetto deposition at 33-37.

. Majority Opinion at 1544-46 (emphasis added).

. — U.S. -, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

. Id., — U.S. at -, 114 S.Ct. at 1978.

. Id., U.S. at -, 114 S.Ct. at 1980.