Ervin M. **RAINES**, Dale Frame, Selma Randle, Martin Lacquey, Claudie Smith, and James Delon, individually, and on behalf of a class of persons similarly situated, Plaintiffs,

v.

**STATE OF FLORIDA**, Harry K. Singletary, Jr., in his official and individual capacities as Secretary of the Florida Department of Corrections, Richard G. Kirkland, in his official and individual capacities as Superintendent of Holmes Correctional Institution, and Henry D. Alford, in his official and individual capacities as Assistant Superintendent of Holmes Correctional Institution, Defendants.

No. TCA 92–40311–WCS.

United States District Court, N.D. Florida, Tallahassee Division.

March 21, 1997.

Peter M. Siegel, Florida Justice Institute Inc., Miami, FL, for Ervin M. Raines, Dale Frame, Selma Randle, Martin Lacquey, James Delon, Claudie Smith.

Susan Adams Maher, Dept. of Corrections, Legal Services, Tallahassee, FL, for State of Florida, Harry Singletary.

Susan Adams Maher, Dept. of Corrections, Legal Services, Tallahassee, FL, Judy Bone, Dept. of Corrections, State of Florida, Tallahassee, FL, for Richard Kirkland, Henry Alford.

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SHERRILL, United States Magistrate Judge.

Pending is Defendants' motion for summary judgment, doc. 91, and Plaintiffs' response, doc. 97. Plaintiffs allege in their third amended complaint that they have been denied the opportunity to earn the maximum amount of incentive gain time afforded by statute due to their disabilities. They allege that this violates the Eighth Amendment, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq., and Title II of the Americans with Disabilities Act of

1990(ADA), 42 U.S.C. § 12101, *et seq.* Doc. 56. Plaintiffs represent a class with four subclasses defined as:

All persons who are currently in the custody of the Florida Department of Corrections, or who, in the future will come into the custody of the Florida Department of Corrections, who are physically or mentally disabled or handicapped (the definition of "handicap" or "disability" is limited to the statutory definitions for the statutory claims) and who, because of their disability or handicaps, are not provided with a job assignment, educational assignment, or other opportunity to earn the maximum amount of incentive gain time available to all prisoners eligible to earn incentive gain time. The class is further defined and limited to the following subclasses of such inmates:

1. Inmates who are classified X–5.

2. Inmates who are provided mental health treatment at the Corrections Mental Health Institute.

3. Inmates who are housed at a reception and medical center for treatment.

4. Inmates who are classified medical grade 3 or 4 who are impeded in the opportunity to earn incentive gain time due to the lack of a policy which directs that their disability be taken into account in determining the amount of incentive gaintime to be awarded.

Doc. 53. Injunctive relief is sought on behalf of Plaintiffs who are still in the custody of the Florida Department of Corrections (DOC), and Plaintiffs Raines and Frame, who are not, seek damages.

## I. Undisputed material facts

The statute at issue here, Fla. Stat. § 944.275(4)(b)(1995), provides in relevant part:

For each month in which an inmate works diligently, participates in training, uses time constructively, or otherwise engages in positive activities, the department may grant incentive gain-time in accordance with this paragraph.

In three following subparagraphs the statute establishes limitations upon the award of gain time according to the date and nature of the offenses committed.

At the time this suit was filed, the DOC rule implementing this statute, Fla.Admin.Code § 33–11.0065(2)(1991), provided that a prisoner who was "medically unable" to earn incentive gain time would, nonetheless, have an opportunity to earn the full amount of incentive gain time available to be earned by engaging in "positive activities." Subparagraph (3)(d)(3) of Fla.Admin.Code § 33–11.065 provided:

Inmates who are medically unable to perform work or other assignments may be recognized with incentive gain time through participation in self-betterment programs and other positive activities provided their medical status permits. Other facts that might be evaluated would include adherence to instructions of the medical staff in following treatment regimens, relationships with medical staff and other medical patients, and, as their health permits, fulfillment of any housekeeping or other assignments given.

Complaint, doc. 56, para. 35; Answer, doc. 65, para. 35. Additionally, Fla.Admin.Code provided that prisoners

unassigned from work and education ... may be awarded 0 to 4 days gain time when overall "above satisfactory" in his institutional adjustment. If self-betterment programs are recommended by the team and are available, the inmate should be actively involved. If programs are not recommended, the inmate may still be considered as noted above.

Complaint, doc. 56, para. 36; Answer, doc. 65, para. 36 (not denied by the answer).

As early as June 16, 1991, Defendants Alford and Kirkland at Holmes Correctional Institution determined that prisoners assigned to the disabled squad (who were unable to work) would be eligible to earn no more than four days of incentive gain time per month, rather than the full 20 days which other prisoners could earn.[1] Complaint, doc.

---

1. Defendants contend that this practice was unauthorized and was corrected. Doc. 65, para. 49. The matter is immaterial to the claim for injunctive relief, but creates a material dispute of fact as to the claim of Raines and Frame for damages, a claim which does not survive summary judgment as discussed ahead.

56, paras. 37–40 (especially para. 39); Answer, doc. 65, paras. 37–40 (especially para. 39).

In 1994, Fla.Admin.Code § 33–11.0065(2) was amended to eliminate the provision quoted above. Complaint, doc. 56, para. 41; Answer, doc. 65, para. 41. In its place, incentive gain time is now earned based upon security, work, and program components. *Id.* No prisoner now can earn the maximum amount of incentive gain time unless he or she has engaged in activities involving all three components at an outstanding level. Answer, doc. 65, para. 42. The work and program components are designated the performance rating, and the security component results in a security rating. Fla.Admin.Code § 33–11.0065(3). To achieve the maximum award available, a prisoner must be involved in some sort of assigned work or an assigned program (such as education). Fla.Admin.Code §§ 33–11.0065(3)(a)4 and doc. 92, appendix B, affidavit of S. Fred Roesel.

The first subclass includes prisoners who are assigned the X–5 work capacity classification. An X–5 prisoner is defined by the DOC as a prisoner who is "unable to engage in any work, recreational or training activities by reason of any medically determinable physical or mental impairment." Doc. 92, exhibit A, attachment A, para. H, p. 5. The parties agree that these prisoners cannot be assigned to or perform any work or program, even with assistance. Thus, they are not routinely available for work.

The second subclass are those prisoners assigned to the Corrections Mental Health Institution (CMHI). A prisoner assigned there has been found to be "mentally ill and is in need of treatment." Fla.Stat. § 945.43(1). The CMHI has 110 beds, and averages about 90 prisoners assigned, and these prisoners stay for an average of 180 days. Doc. 92, exhibit E, deposition of Katherine H. Heffner, pp. 4–5. Prisoners assigned to the CMHI for treatment are encouraged to maintain their personal hygiene and the cleanliness of the areas around them as a part of their treatment, but they are not

forced to do so and earn no incentive gain time for doing so. *Id.,* pp. 10–11. Their treatment plan includes encouragement to improve in personal hygiene, cleanliness of the living area, cooperation with staff, and attitude. *Id.,* p. 9. There are no work assignments for these prisoners. *Id.,* p. 7. Prisoners assigned to CMHI can earn up to 12 days of incentive gain time a month, eight days for security gain time and four days for program gain time; they cannot earn work gain time. *Id.,* p. 7; Fla.Admin.Code § 33–11.065(3).

Plaintiffs have submitted the affidavit of Eddie Ivy. Ivy spent nearly 14 months at the CMHI, receiving from four to eight days a month incentive gain time as a part of the security component. Doc. 98, exhibit E. He was required to attend various programs as a part of therapy, and worked nearly every day doing cleaning. He earned no gain time for participation in the programs or for his work cleaning. *Id.*

The third subclass consists of prisoners assigned to a reception center for medical treatment. Typically these prisoners are not assigned a job during the first 60 days at a reception center while they await or receive medical treatment, and thus cannot earn work incentive gain time. Doc. 92, exhibit F, deposition of Thomas Earl Patterson, p. 5. They may be assigned to a job and earn the work incentive gain time after 60 days at a reception and medical center if a physician determines that he or she is capable of working.[2] *Id.,* p. 7; Fla.Admin.Code § 33–11.065(3).

Since it is possible for a prisoner to work only three days a week and still earn the maximum incentive gain time, prisoners who become temporarily unable to work at an institution other than a reception center could, nonetheless, still earn the maximum incentive gain time. Doc. 36, exhibit F, testimony of Wilson Bell in *Stapleton v. Singletary,* case no. 88–14178–Civ–Paine (S.D.Fla), vol. 8, p. 1327.

**2.** An exception appears to exist, however, at the Central Florida Reception Center. There, prisoners appear to be assigned a job when they arrive, without waiting 60 days. Doc. 111, deposition of Randall Bryant, p. 4. As a consequence, these prisoners have the opportunity to earn the maximum amount of incentive gain time available. *Id.,* pp. 4–5. The only exception are prisoners classified X–5. *Id.,* p. 10.

Plaintiff has submitted affidavits of several prisoners setting forth their experiences in the award of incentive gain time at reception centers. Thomas Wolfgang avers that he is a medical grade 3 confined to a wheelchair. Doc. 98, exhibit D. He works as a button tailor at his permanent institution. He was assigned to the Central Florida Reception Center from August 15, 1994, to March 1995. He was assigned a houseman job, but never received the full amount of gain time. *Id.*

Steven Brent Hamilton similarly states in his affidavit that he spent nearly a year at the North Florida Reception Center. He was not assigned a job as houseman, the only job which he might have been able to do. He was unable to earn the full amount of gain time. *Id.* Scott Hasemeier similarly avers that he is a medical grade 4, was assigned for an extended period of time at the South Florida Reception Center, did not receive a job assignment, and received only 12 days per month incentive gain time. *Id.* To the same effect is the affidavit of Eric A Unzueta. Doc. 105.

With regard to subclass four, the DOC does not have an express policy which takes into account the *disability* of prisoners who are classified medical grades 3 and 4 in the calculation of incentive gain time. Doc. 91, p. 12. It does, however, have regulations which mandate that a prisoner's "capabilities" be considered when the evaluation is made. Fla.Admin.Code § 33–11.0065(3)(a)1 provides that:

> The security rating for the month shall be determined through the review of the four security behavioral objectives, *while considering the inmate's capabilities.*

(Emphasis added.) Similarly,

> The monthly performance rating shall be determined through the review of the five performance behavioral objectives, *while considering the inmate's capabilities.*

(Emphasis added.) There is some evidence that institutions were instructed "to whatever extent was reasonable to provide [prisoners whose ability was extremely limited because of physical condition] to provide them the opportunity to perform, produce, or partici-

pate in education and whatever to get the ability to earn gain time." Doc. 92, exhibit D, deposition of S. Fred Roesel, p. 20.

Defendants have also produced statistics comparing the awards of incentive gain time for prisoners in medical grades 1 and 2 to those in medical grades 3 and 4. Doc. 92, exhibit C, affidavit of William Bales.[3] In the period July 1994 through December 1994, prisoners who were classified to medical grades 3 and 4 were awarded on the average 1.2 *more* days of incentive gain time (103.2 days versus 102 days) than those in grades 1 and 2. Id. In the period January 1995 through June 1995, prisoners who were classified medical grades 3 and 4 were awarded on the average 3.9 fewer days of incentive gain time (104.4 days versus 108.3 days) than those in grades 1 and 2, a 3.6% difference. *Id.* In the period July 1995 through December 1995, prisoners who were classified medical grades 3 and 4 were awarded on the average 2.1 fewer days of incentive gain time (106.6 days versus 108.7 days) than those in grades 1 and 2, a 1.9% difference. *Id.* In the latter two periods where some disparity is shown, the difference on average per month is 0.7 days and 0.3 days respectively. *Id.* There is no evidence that the disparity in the latter two six month periods is statistically significant.

Bales excluded from these statistics nine categories of prisoners. For example, excluded were those who were not in prison the entire period. *Id.* There is no evidence that Bales skewed the statistics by excluding prisoners assigned to medical grades 3 and 4 who had also earned less than the averages of incentive gain time.

Plaintiffs have submitted some evidence that individual prisoners classified medical grade 3 or 4 have had varying experiences in treatment with regard to job assignments and award of gain time. Jack Bentley avers that he is assigned a medical grade 4, and was able to earn the full amount of gain time because he was given a job which he could perform. Doc. 105. He states that at other institutions, he was given a job which he could not perform due to his impairments,

---

**3.** Bales is the DOC Bureau Chief of Planning, Budget, and Research. He has a degree in criminology and has taken course work in statistics.

Doc. 92, exhibit G, deposition of William Bales, pp. 3–4.

and was not awarded the full amount of gain time because of his deficient job performance. *Id.* The affidavit of Lakeith Raqib Sharif recounts a similar experience. Doc. 102.

The correctional interest which underlies the DOC regulation which implements the gain time statute was explained by S. Fred Roesel, Coordinator of Classification Services for the DOC:

> ... Assignments to work or programs also have a rehabilitative aspect. Inmates are required to report to the job or program site at a designated time and to take instruction. The refusal to perform an assignment constitutes a disciplinary offense for which an inmate may be subject to confinement and the loss of gain time. While it is not necessary in order to run prisons for all available inmates to be assigned (some jobs require little work) but because assigning inmates serves rehabilitative and management purposes, the Department assigns all available inmates to work and/or programs.

> In order to receive maximum amounts of monthly incentive gain time, an inmate must be assigned to work or a program assignment. The policy of requiring an assignment in order to receive a maximum award is based upon the needs of running a prison and rehabilitative goals, but also allows for the equal opportunity to earn gain time. The policy recognizes that some inmates would fail to perform to expectations, not cooperate with staff, or feign illness or injury if they were permitted to earn maximum awards of gain time and were not required to perform an assignment. This is a legitimate concern of the Department.

Doc. 92, exhibit B, pp. 1–2.

## II. Legal standards governing a motion for summary judgment

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the

nonmoving party's case. *Celotex Corporation v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If they do so, the burden shifts to the Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence is insufficient. There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof. *Anderson v. Liberty Lobby,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). However, "the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor." *WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988).[4]

## III. The Eighth Amendment claim

█ "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment...." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993), quoting *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–1006, 103 L.Ed.2d 249 (1989). To prevail on an Eighth Amendment claim a Plaintiff must prove a(1) condition of confinement that inflicted unnecessary pain or suffering (the objective component), (2) deliberate indifference to that condition (the subjective component), and (3) causation. *LaMarca v. Turner,* 995 F.2d 1526, 1535 (11th Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (citations omitted).[5]

---

4. The court must resolve *reasonable* doubts in favor of the non-moving party, but is not required to resolve *all* doubts in favor of the non-moving party. *Earley v. Champion International Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

5. *See Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) ("After incarceration, only the 'unnecessary and wanton infliction of pain'... constitutes cruel and unusual

"The objective component tests whether that punishment is objectively harmful enough to violate the constitution." *Tittle v. Jefferson County Comm'n,* 10 F.3d 1535, 1541 (11th Cir.1994)(Kravitch, J., concurring, citations omitted). *Helling* held that demonstration of an Eighth Amendment violation

> requires more than a scientific and statistical inquiry into the seriousness of the potential harm.... It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

509 U.S. at 35, 113 S.Ct. at 2482.

With respect to the subjective component, negligence, or a lack of due care under the circumstances, is insufficient to show a violation of the constitution. *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 671, 88 L.Ed.2d 677 (1986). Proof of deliberate indifference is required. "Deliberate indifference" is a culpable state of mind of the Defendant to unnecessarily and wantonly inflict pain or harm upon a prisoner. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To prove deliberate indifference, a "plaintiff must prove that the [defendant] possessed knowledge of the infirm condition and of the means to cure that condition, so that a conscious, culpable refusal to prevent the harm can be inferred from defendant's failure to prevent it." *LaMarca v. Turner, supra,* 995 F.2d at 1536 (quotation and citation omitted).

■ The Eighth Amendment claim, therefore, fails at several levels. First, denial of liberty is not the denial of the "basic human needs" enumerated by *Helling, i.e.,* food, clothing, shelter, medical care, and reasonable safety, and thus the Eighth Amendment is not implicated. Moreover, there is no evidence that this regulation was adopted with the subjective intent to punish prisoners because they are disabled. The undisputed fact is that the regulation was adopted to serve as an incentive for prisoners not to feign illness and to work, if possible, not to punish prisoners because of real disability or illness.

Finally, the objective component is absent. While a disincentive to malinger is penal in nature,[6] it is not cruel. It does not offend contemporary standards of decency. Accordingly, Defendants are entitled to summary judgment as to the Eighth Amendment claim.

## IV. The ADA and Rehabilitation Act claims

### A. Whether the ADA applies to a prison

■ Interpretation of Title II of the ADA normally should be guided by decisions construing the Rehabilitation Act. *Patton v. TIC United Corp.,* 77 F.3d 1235, 1245 (10th Cir.1996); *Easley v. Snider,* 36 F.3d 297, 300–301 (3rd Cir.1994). Section 504 of the Rehabilitation Act prohibits a federally funded state program from discriminating against a handicapped individual solely on the basis of the individual's handicap. *School Board of Nassau County v. Arline,* 480 U.S. 273, 275, 107 S.Ct. 1123, 1125, 94 L.Ed.2d 307 (1987). The Rehabilitation Act provides:

> No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a) (1982). A "program or activity" is defined as, among other things, "a department, agency, ... or other instrumentality of a State...." 29 U.S.C. § 794(b)(1)(A).

The Ninth Circuit has held, and the Eleventh Circuit has agreed, that prisoner claims are potentially cognizable under Section 504 of the Rehabilitation Act. *Harris v. Thigpen,* 941 F.2d 1495, 1522, n. 41 (11th Cir.1991), agreeing with *Bonner v. Lewis,* 857 F.2d 559 (9th Cir.1988). In *Harris v. Thigpen,* the

---

punishment forbidden by the Eighth Amendment") (citations omitted).

6. There is obviously a penal intent with regard to malingering, but not with regard to true disability.

court noted with approval the Ninth Circuit's construction of the "any program" language of § 504 in conjunction with the congruence of the Act's goals with those of prison officials. *Id.* In *Bonner,* the court pointed out that "the plain language of the Justice ·Department's implementing regulations, 28 C.F.R. § 42.503, and the Act itself applies to '*any program or activity* receiving Federal financial assistance,' 29 U.S.C. § 794...." 857 F.2d at 562. Further, the court held that the Rehabilitation Act's goals of independent living and vocational rehabilitation should "mirror the goals of prison officials as they attempt to rehabilitate prisoners and prepare them to lead productive lives once their sentences are complete." *Id.*

The provisions of Title II of the ADA are almost identical to those in the Rehabilitation Act. Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the *services, programs, or activities* of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (emphasis added). A "public entity" includes "any State or local government" and "any department, agency, ... or other instrumentality of a State...." *Id.* at § 12131(1). Title II of the ADA applies:

> to *all programs, activities, and services* provided or made available by state and local governments or instrumentalities or agencies thereto, *regardless of whether or not such entities receive Federal financial assistance.*

*House Comm. on Educ. and Labor,* H.R. Rep. 101–485(II), 101st Cong., 2nd Sess., pt. 2 at 84, *reprinted in,* 1990 U.S.C.C.A.N. 303, 367 (emphasis added).

The Florida correctional system, assigned to the Department of Corrections, is just as much a program and activity of the State of Florida as other programs assigned to the State executive branch; *e.g.,* building and maintenance of roads (the Department of Transportation), regulating banking (the Department of Banking and Finance), or regu-

lating elections (the Department of State). There is no exception in either the ADA or the Rehabilitation Act [7] for state prisons. If a plain statement is required that the ADA applies to state prisons, the foregoing is sufficient.

Some courts read *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) as holding that "the Supreme Court has changed the review of the applicability of federal statutes to states so that absent a clear indication of congressional intent to apply the RA [Rehabilitation Act] to state prisons, a court cannot assume Congress intended to do so." *Clark v. State,* —— F.Supp. ——, 1996 WL 628221 (N.D.Cal.1996), p. 3. *Ashcroft,* however, concerned a qualification for state judicial officers embedded in a state constitution. The Court noted particularly that a qualification to hold judicial office

> goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a ·sovereign entity. Through the *structure* of its government, and the character of those who exercise government authority, a State defines itself as sovereign.

501 U.S. at 460, 111 S.Ct. at 2400 (emphasis added). The operation of a state prison system does not concern the structure of a state sovereignty. *Cf. U.S. v. Lot 5, Fox Grove, Alachua County, Fla.,* 23 F.3d 359, 361–363 (11th Cir.1994), *cert. denied,* 513 ·U.S. 1076, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995) (the "plain statement" rule does not apply to determine whether forfeiture of a Florida residence pursuant to 21 U.S.C. § ·881(a)(7) preempted Florida homestead exemption law). Hence, the need for application of a "plain statement" rule is not present in this case.

Congress directed the Attorney General to issue regulations implementing Title II of the ADA. 42 U.S.C. § 12134(a); *see,* H.R. Rep. 101–485(II) at 84, 1990 U.S.C.C.A.N. at 367; *also see, House Comm. on the Judiciary,* H.R. Rep. 101–485(III), 101st Cong., 2nd Sess., pt. 3 at 52, *reprinted in,* 1990 U.S.C.C.A.N. 449, 475. Consistent with Con-

---

**7.** Defendants do not argue that the DOC does not receive federal assistance, and the ·parties seem to agree that if the ADA applies to the DOC, then the Rehabilitation Act does too, as the Eleventh Circuit has held.

gressional intent, the Attorney General explained that the regulations implementing Title II apply to all public entities, regardless of whether or not they receive federal financial assistance. 56 F.R. at 35696 (1991). Furthermore, the regulations apply to all "programs that provide state or local government services or benefits." *Id.*[8] Thus, Title II of the ADA and its implementing regulations incorporate the "nondiscrimination principles" of Section 504 and extend them to "a much wider array of institutions and businesses, including services provided by states and municipalities" without regard to the receipt of federal financial assistance. *Easley v. Snider,* 36 F.3d 297, 300–301 (3rd Cir.1994); *Vaughn v. Sullivan,* 906 F.Supp. 466, 473, n. 11 (S.D.Ind.1995).

In short, the ADA is broadly written. By applying to any program, it covers state prison programs. There is no ambiguity in the statute, and an explicit mention of state correctional systems is not required. Further, the Attorney General, whose regulatory interpretation is entitled to deference by this court, has found that the ADA applies to state prisoners.

There is *dicta,* however, from several circuit courts expressing disbelief that Congress intended to included state correctional facilities and prisoners within the reach of the ADA. *Bryant v. Madigan,* 84 F.3d 246, 248 (7th Cir.1996), *reh. denied,* 91 F.3d 994, (7th Cir.1996) expressed skepticism that the ADA applies to states prisoners, noting that judicial exceptions to the plain meaning of statutes may be applied to avoid "absurd" results, and finding that prisoners may not be "qualified individuals" as intended by Congress. 84 F.3d at 248–249. But *Love v. Westville Correctional Center,* 103 F.3d 558 (7th Cir.1996) held that *Bryant v. Madigan* had not decided the issue. *Love* also declined to decide the question as it had not been adequately briefed.

In *Torcasio v. Murray,* 57 F.3d 1340 (4th Cir.1995), *cert. denied sub nom., Torcasio v. Angelone,* —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996), the Fourth Circuit similarly expressed strong doubt that the ADA applies to prisoners, finding that Congress must make "clear and manifest" its intention to pre-empt a state's historic interest in operating a state prison. *Torcasio,* however, also did not decide the question.

Though the question is not yet settled in the Seventh and Fourth Circuits, the Tenth Circuit explicitly ruled the ADA does not apply to employment opportunities for inmates in state prisons. *White v. State of Colorado,* 82 F.3d 364, 367 (10th Cir.1996). It relied upon the reasoning of *Williams v. Meese,* 926 F.2d 994, 997 (10th Cir.1991), which had held that the Rehabilitation Act does not apply to prison employment opportunities. The precedent on the latter subject in this circuit is to the contrary as discussed previously.

The Ninth Circuit, however, has assumed without directly deciding that the ADA applies to state prisoners. *Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir.1996).[9] *Inmates of Allegheny County Jail v. Wecht,* 93 F.3d 1124 (3rd Cir.1996) held that the ADA applies to county jail prisoners, but rehearing *en banc* has been granted, and the panel opinion has been vacated. 93 F.3d 1146 (3rd Cir., September 20, 1996).

A few district court decisions have simply assumed, without discussion, that the ADA applies to prisoners. *E.g., Dean v. Knowles,* 912 F.Supp. 519, 521 (S.D.Fla.1996); *Harrelson v. Elmore County, Ala.,* 859 F.Supp. 1465, 1469 (M.D.Ala.1994); *Clarkson v. Coughlin,* 145 F.R.D. 339, 348 (S.D.N.Y. 1993); *Noland v. Wheatley,* 835 F.Supp. 476 (N.D.Ind.1993). There are, however, a number of well-reasoned district court opinions which find that Congress intended that the ADA extend to state prisoners. *Kaufman v.*

---

**8.** "[T]he interpretation of [the] agency charged with the administration of [this] statute is entitled to substantial deference." *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

**9.** The Ninth Circuit also reaffirmed that the Rehabilitation Act applies to state prisoners. *Gates v. Rowland,* 39 F.3d 1439, 1446 (9th Cir.1994).

*Carter,* 952 F.Supp. 520 (W.D.Mich.1996) and cases cited, p. 10; *Fennell v. Simmons,* 951 F.Supp. 706 (N.D.Ohio 1997); *Niece v. Fitzner,* 941 F.Supp. 1497, 1505–1511 (E.D.Mich. 1996); *Clark v. State,* 1996 WL 628221 (N.D.Cal.1996); *Armstrong v. Wilson,* 942 F.Supp. 1252, 1258–1260 (N.D.Cal.1996); *Outlaw v. City of Dothan, Ala.,* 1993 WL 735802, pp. 3–4 (M.D.Ala.1993) (finding a jail shower to be a service, program or activity of a public entity).

There are also a few district court decisions reaching the opposite conclusion. *Pierce v. King,* 918 F.Supp. 932 (E.D.N.C. 1996); *Staples v. Virginia Dept. of Corrections,* 904 F.Supp. 487, 490 (E.D.Va.1995); *Gorman v. Bartch,* 925 F.Supp. 653, 655–657 (W.D.Mo.1996) (person in police custody after arrest); *Halpin v. Mathews,* case no. 94–1579–Civ–T–24B (M.D.Fla., February 21, 1997), attached to doc. 112. Finally, *Longo v. Barbo,* 1996 WL 453570 (D.N.J.1996) expressed skepticism that the ADA applies to prisoners. There, like *Torcasio,* the court found for purposes of qualified immunity that it was not clearly established in 1994 that the ADA applies to a state prison.

The analysis of the decisions which have concluded that Congress intended the ADA to apply to state prisoners cannot be improved upon. Summarizing these, the ADA is not ambiguous. Thus, there is no need to resort to canons of construction to resolve ambiguity. A plain statement that the ADA applies to prisons is not required either. It is inescapable, therefore, that Congress intended the ADA to apply to state prisoners. Accordingly, Defendants' argument that the ADA does not apply in this case is rejected.

**B. The merits of the ADA and Rehabilitation Act claims**

The standard of proof for an ADA claim is similar to a Title VII claim:

In order to establish a prima facie case of discrimination in violation of the ADA, the plaintiff must prove that (1) she has a disability; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability.

*Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996). Applying these principles in a prison setting, it has been held that:

In order to establish a violation of Title II of the ADA, Plaintiff must show: (1) that he is a qualified individual with a disability as defined by the ADA; (2) that he was excluded from participation in the facility's trustee program; and (3) that the exclusion was because of Plaintiff's disability. *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 846 F.Supp. 986 (S.D.Fla.1994); *see also, Harris v. Thigpen, [supra]* 941 F.2d 1495 (11th Cir.1991) (establishing the same standard under the Rehabilitation Act, 29 U.S.C. § 794).

*Dean v. Knowles, supra,* 912 F.Supp. at 519.

A "disability" is defined by the ADA, 42 U.S.C. § 12102(2) as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12131(2) defines a "qualified individual with a disability" as:

An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

A claim under the Rehabilitation Act is essentially the same as an ADA claim:

[I]n order to obtain relief under section 504 appellants must establish that: 1) they are "handicapped" within the meaning of the Act; 2) they are "otherwise qualified"; 3) they are excluded from programs or activities solely because of the handicap; and 4) the programs or activities from which they are excluded are operated by an agency that receives federal financial assistance.

*Harris v. Thigpen,* 941 F.2d 1495, 1522 (11th Cir.1991). "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.". *Harris v. Thigpen, supra,* 941 F.2d at 1525,

*quoting Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979).

#### 1. The first three subclasses

█ Plaintiffs in the first three subclasses argue that because they can engage in "positive activities" despite their disabilities, they are "otherwise qualified" to participate in (that is, are eligible for consideration for) the maximum award of incentive gain time allowed by statute. They argue that this is especially so because prior to 1994, Fla.Admin.Code § 33–11.065(3)(d)(3) provided that incentive gain time could be awarded for "positive activities" other than work, *e.g.:* "participation in self-betterment programs," "adherence to instructions of the medical staff in following treatment regimens," and "relationships with medical staff and other medical patients."

Defendants counter that those prisoners in the first three subclasses who are not routinely available for work are not "otherwise qualified" to participate in the "work" portion of the incentive gain time program. They argue that the DOC has significant penological interests both in deterring exaggerated claims of disability and in involving prisoners in the rehabilitative process of reliably reporting to work, abiding by instruction, and adhering to the task assigned, however minimal. They argue that to rule otherwise would cause significant hardship in the management of the DOC and would fundamentally alter the incentives established by the regulation.

The ADA does not displace the basic requirements of the public program. "The purpose of the Act is to place those with disabilities on an equal footing, not to give them an unfair advantage." *Kornblau v. Dade County,* 86 F.3d 193, 194 (11th Cir. 1996) (finding that Dade County was not required to provided a parking place for a disabled person in an area in which she would not be entitled to park if she were not disabled). *Cf. Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 846 F.Supp. 986 (S.D.Fla.1994) ("[T]he ADA does not require that persons

with disabilities be given 'adequate recreational programs' or, for that matter, any recreational programs. However, the ADA does require that persons with disabilities be given equal access to whatever benefits the City offers to persons without disabilities.") 846 F.Supp. at 990 n. 11 (citations omitted).

It is evident from the reported decisions, however, that to be "otherwise qualified," a person need only possess the basic eligibility requirements of the public program in which the individual seeks to participate. In *Tugg v. Towey,* 864 F.Supp. 1201, 1205 (S.D.Fla. 1994), the court held that the plaintiffs were "qualified" individuals under the ADA because they met the county residence requirement for receipt of mental health counseling. In *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 853 F.Supp. 424, 425 (S.D.Fla.1994), another ADA case, the court found that residents and non-residents were permitted to take part in city leisure time activities. It reasoned, therefore, that plaintiffs, who were both residents and non-residents, were "qualified individuals" to participate in those city leisure time activities.

There are other examples. In *Doe v. Judicial Nominating Commission for Fifteenth Judicial Circuit of Florida,* 906 F.Supp. 1534, 1538 (S.D.Fla.1995), it was found that an attorney who was qualified to serve as a state judge was a "qualified individual" for purposes of an ADA challenge to Judicial Nominating Commission questions concerning his physical and mental health. In *Lundstedt v. City of Miami,* 1995 WL 852443, * 9 (S.D.Fla.1995), there was an apparent requirement that one must be a resident of the city to be a firefighter. The court held that the residency requirement was not an impediment to "qualified individual" status because the applicant seeking reinstatement could move into the city.[10] Finally, *Ethridge v. State of Ala.,* 860 F.Supp. 808, 819 (M.D.Ala.1994) held that an individual who had not completed a required course of training and could not shoot a firearm in the

---

**10.** The court, of course, implicitly acknowledged that residency was a basic requirement for participation in the program.

"Weaver" stance was not "otherwise qualified" for the job of police officer.

To determine the "otherwise qualified" question in the case at bar, the court must first isolate the "program" or "activity" at issue.[11] If the "program" or "activity" is not precisely identified, then the basic eligibility requirements cannot be determined. As noted above, the statute provides that up to the maximum amount of incentive gain time may be awarded when a prisoner "works diligently, participates in training, uses time constructively, or otherwise engages in positive activities."

The "program" established by the statute, therefore, creates four overlapping but distinct opportunities to earn the maximum amount of incentive gain time. A prisoner conceivably could use his time constructively, by reading or writing letters to his family, or could engage in a positive activity, by maintaining courteous, obedient relationships with health care staff and correctional officers, and still not be engaged in training or work.

Since the statute is permissive, Defendants were undoubtedly authorized by state law to adopt a regulation implementing the statutory program. It is further undoubtedly true that Defendants had discretion under the statute to divide up the total maximum amount of gain time authorized into discrete subcategories.

But the "program" relevant to the ADA claim is the one established by the statute. The "program" provides an opportunity to earn the maximum amount of gain time by engaging in any one or combination of the four categories of activities. The regulation is an administrative decision choosing among permissible alternatives under state law. When administrative choices are made, however, the ADA and the Rehabilitation Act ensure that the choices do not partially exclude "otherwise qualified" persons from full participation due to their disability. As the Supreme Court said with respect to the Rehabilitation Act:

> The balance struck in *Davis*[*Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) ] requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. *The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled;* to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

*Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985) (emphasis added).

The regulation at issue here excludes persons with disabilities from enjoying the full opportunity to participate in the "program" established by statute. It does so by fragmenting the opportunity to earn the maximum amount of incentive gain time, creating lesser opportunities available only for engaging in one of the four statutory activities. While the sum of the separated opportunities is the same for a healthy prisoner, it is not for the disabled.

That the statute has been implemented by regulation is immaterial to this result since the "program" is defined by the statute. This suit could have arisen, and indeed, did arise, as a challenge to the isolated decision of a single superintendent to exclude the disabled prisoners from the maximum opportunity to earn incentive gain time. The ADA and the Rehabilitation Act are implicated by this sort of administrative decision, whether local or universal, when the effect is to exclude an "otherwise qualified" person from the full opportunity afforded by the "program."

Thus, Defendants' argument, that the members of the first three subclasses are not "otherwise qualified" to work because they are not routinely available for work, is a defense which necessarily begs the question. It is a defense which falters because it must rely upon a rewriting of the statute which creates the program.

11. *See Does 1–5 v. Chandler,* 83 F.3d 1150, 1155 (9th Cir.1996) ("The key issue in this case, therefore, is one of characterization. The Court concludes that the Hawaii GA program is, functionally, made up of a program of support for needy families and a separate program of support for the needy disabled. The ADA does not require equivalent benefits in different programs.").

In judging whether reasonable accommodations exist, "it is entirely possible" that the reasonableness of the accommodations must be judged in light of "overall institutional requirements." *Love v. Westville Correctional Center*, 103 F.3d 558 (7th Cir.1996), citing *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). "Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account." *Id.* Similarly, *Gates v. Rowland, supra,* applied the principles of *Turner v. Safley* in its analysis of the way in which the Rehabilitation Act is to be applied. The court found: "There is no indication that Congress intended the Act to apply to prison facilities irrespective of the considerations of the reasonable requirements of effective prison administration." 39 F.3d at 1447. The court held, therefore, that in determining the reasonableness of the prison's compliance with the Rehabilitation Act, a court should consider: whether there is a valid, rational connection between the prison policy and the legitimate governmental interest put forward to justify it; whether there are alternative means available; the impact the accommodation of the Rehabilitation Act right will have on guards, other prisoners, and prison resources; and whether the policy is an exaggerated response to prison concerns. *Id.*

These are sound principles of law to be applied if the reasonableness of an accommodation demanded of Defendants is to be determined. But the members of the first three subclasses are "otherwise qualified" to participate in the "program" defined by the statute without accommodation by Defendants. Even the most disabled prisoner can

"use time constructively" or engage in "positive activities."

Plaintiffs seek no accommodation. Therefore, there is no necessity to determine whether an accommodation sought by Plaintiffs could reasonably be provided by Defendants. It is only at this second stage that there is a need to consider the financial and administrative burdens upon a Defendant, or whether the accommodation would work a fundamental change in the "program." [12] In sum, though Defendants have articulated major penological concerns, the court cannot consider them. Defendants are not entitled to summary judgment on the merits of the ADA and Rehabilitation Act claims of the first three subclasses.

Consideration of the motion for summary judgment has prompted some concerns about the propriety of continued certification of subclass three, however. The concern is whether prisoners in a transient status for medical treatment at reception centers are "disabled" as understood by the ADA or the Rehabilitation Act. The court is aware that transient medical prisoners at reception centers are usually there for a specialty consultation which may or may not be for a serious medical need. Whether those with medical needs are, for class action purposes, disabled or perceived to be disabled, is another matter. The parties are notified of the court's concerns so that evidence and argument can be presented at trial.[13]

**2. The fourth subclass**

▪ At oral argument on the motion for class certification, Plaintiffs clarified that the class claim for the fourth subclass is that prisoners carrying a medical grade 3 or 4

---

**12.** "When a person is *not* able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions. [*Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)]. Accommodation is not reasonable if it imposes 'undue financial and administrative burdens' on a grantee, *Southeastern Community College v. Davis*, 442 U.S. at 412, 99 S.Ct. at 2370, or if it requires 'a fundamental alteration in the nature of [the] program.' *id.* at 410, 99 S.Ct. at 2369." *School Board of Nassau County, Florida v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987)

(emphasis added); *Harris v. Thigpen*, 941 F.2d at 1527. But if an accommodation is not needed, the question of "reasonableness" does not arise.

**13.** As the parties know, an order of class certification is conditional and may be altered in whole or in part before a decision on the merits. Fed. R.Civ.P. 23(c)(1) and (4); *Forehand v. Florida State Hosp. at Chattahoochee*, 89 F.3d 1562, 1566 (11th Cir.1996). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Id., citing General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

classification tend to receive less incentive gain time because the Department does not have a uniform policy which directs that, in considering the amount of gain time to be awarded, allowances must be made for the disabilities of such prisoners. Doc. 53, p. 7. It was noted that absent this common factor, the claims would be too dissimilar for class treatment. *Id.*, p. 14, n. 5.

Defendants have a written policy that the capabilities of the prisoner must be considered in determining the incentive gain time to be awarded to medical grades 3 and 4. It makes little difference whether this policy is expressed as it is in the positive (that capabilities must be considered), or the negative (that disabilities must be discounted). The effect, that there is a policy that there is to be no discrimination in the award of incentive gain time due to disability, is the same.

More important, however, there is no evidence that the slight disparities in the monthly averages of incentive gain time awarded in 1995 to medical grades 1 and 2 compared to medical grades 3 and 4 are statistically significant for discrimination due to disability, especially since the disparity went the other way in the six months from July through December 1994. In sum, while there may be claims of disparate treatment in individual cases, the class claim fails of proof. Defendants are entitled to summary judgment as to subclass four.

**V. Whether the damage claims of Plaintiffs Raines and Frame should be dismissed for lack of subject matter jurisdiction**

▮ Plaintiff Raines alleges that his term of imprisonment was unlawfully extended by almost four months. Doc. 56, para. 53, p. 12. Plaintiff Frame similarly argues that his term will be lengthened unlawfully. *Id.*, para. 59, p. 13. They both seek damages for "prolonged incarceration." *Id.*, p. 23. Their claim, therefore, goes the next step. It not only relies upon the claim that Plaintiffs were procedurally denied the *opportunity* to earn the maximum amount of incentive gain time due to their disabilities, but it seeks to establish the precise amount of incentive gain time

which should have been awarded. The claim necessitates a judicial determination that specific periods of imprisonment were unlawful.

Defendants seek dismissal of these damage claims based upon the reasoning of *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). *Heck* held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

512 U.S. at 484, 114 S.Ct. at 2372 (footnote omitted).

Although *Heck* involved a claim for damages which, if proven, would cast doubt on the plaintiff's conviction, a claim for the deprivation of gain time is encompassed by the opinion. The Court in *Heck* discussed *Preiser*[14] and *Wolff*[15], leading Supreme Court cases considering the overlap between § 1983 and § 2254, both of which involved inmate challenges to the procedures used for the denial of good-time credits. 512 U.S. at 479–481, 114 S.Ct. at 2369–2370. *Preiser* held that a claim seeking restoration of good-time was not cognizable under § 1983. *Wolff* held that, while the claim for restoration of good-time could not proceed under *Preiser*, a claim for damages based on the procedures used to deny good-time could proceed under § 1983. As clarified in *Heck*, *Wolff* did *not* authorize inmates to recover damages for the actual loss of good-time:

> [W]e think the passage [in *Wolff*] recognized a § 1983 claim for using the wrong procedures, not for reaching the wrong result (i.e., denying good-time credits). Nor is there any indication in the opinion, or any reason to believe, that using the wrong procedures necessarily vitiated the

---

**14.** *Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S.Ct. 1827, 1841, 36 L.Ed.2d 439 (1973).

**15.** *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

denial of good-time credits. Thus, the claim at issue in *Wolff* did not call into question the lawfulness of the plaintiff's continuing confinement.

512 U.S. at 481, 114 S.Ct. at 2370.[16]

Thus, Plaintiffs' individual damages claims fall within the category of "other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," which is not cognizable under § 1983 absent a showing that the action or decision was reversed, expunged, invalidated, or impugned by the grant of habeas corpus. 512 U.S. at 484, 114 S.Ct. at 2372; *Miller v. Indiana Dept. of Corrections,* 75 F.3d 330 (7th Cir. 1996) (applying the rule to an administrative determination of entitlement to gain time); *Dixon v. Chrans,* 101 F.3d 1228, 1230 (7th Cir.1996); *Antonelli v. Foster,* 104 F.3d 899 (7th Cir.1997); *Best v. Kelly,* 39 F.3d 328, 330 (D.C.Cir.1994); *Sheldon v. Hundley,* 83 F.3d 231, 233 (8th Cir.1996); *Schafer v. Moore,* 46 F.3d 43, 45 (8th Cir.1995).

In *Antonelli,* the court found *Heck* applicable when a suit is premised "on the invalidity of confinement pursuant to some legal process, whether a warrant, indictment, information, summons, parole revocation, or disciplinary punishment for the violation of a prison's rules." 104 F.3d at 901. Specifically, *Antonelli* held that a claim for damages that a three and one-half month period of detention was invalid because plaintiff was not given a copy of the application for a parole violator warrant was properly dismissed as the prisoner had failed to obtain a ruling that the detention was invalid by means other than a suit for damages. Accordingly, Plaintiffs' damages claims here are governed by *Heck.*

Plaintiffs probably have no remedy now by petition for writ of habeas corpus in state or federal court as they are no longer in custody on the sentence, the execution of which they challenge.[17] *Maleng v. Cook,* 490 U.S. 488, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989). Plaintiffs did have a remedy, however, before they were released. In any event, the court

lacks subject matter jurisdiction of these claims. *Antonelli v. Foster, supra; Carr v. O'Leary,* 1996 WL 598942, * 6 (N.D.Ill.1996). The reasoning of *Heck* applies whether a claimant is in or out of custody. *Schilling v. White,* 58 F.3d 1081, 1086 (6th Cir.1995). The claims do not arise until the claimant obtains a ruling invalidating the denial of incentive gain time. Thus, Defendants' motion for summary judgment, as a motion to dismiss, will be granted and the individual claims of Raines and Frame will be dismissed for lack of subject matter jurisdiction.

For these reasons, it is ORDERED that Defendants' motion for summary judgment, doc. 91, is GRANTED in part. Summary judgment in favor of Defendants is granted as to Plaintiffs' Eighth Amendment claims and the class claims of subclass four. The damages claims of Plaintiffs Raines and Frame are DISMISSED with prejudice for lack of subject matter jurisdiction. In all other respects the motion for summary judgment is DENIED.

---

**16.** Prior to *Heck,* the Eleventh Circuit had made the same distinction. *Gwin v. Snow,* 870 F.2d 616, 624 (11th Cir.1989) (claim challenging parole board procedures could go forward under § 1983 as a favorable decision would not necessarily result in earlier release, while a claim

challenging the specific denial of parole could not proceed under § 1983).

**17.** Raines and Frame have both been released from DOC custody. Doc. 91, p. 13. Frame was to have been released on November 1, 1996. *Id.*